[No. B166041. Second Dist., Div. Five. May 11, 2004.]

MIR KAZEM KASHANI et al., Plaintiffs and Appellants, v.
TSANN KUEN CHINA ENTERPRISE CO., LTD., et al., Defendants and
Respondents.

532

**COUNSEL**

Saied Kashani for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Jeffrey J. Parker and Zareh Jaltorossian for Defendants and Respondents.

**OPINION**

**MOSK, J.**—Plaintiffs Mir Kazem Kashani, Manoutcher G. Nikfarjam, and Shantia Hassanshahi (collectively plaintiffs) allege in their second amended complaint that they and defendant Tsann Kuen China Enterprise Co., Ltd., a Chinese corporation that is the parent corporation or owner of the other named defendants (collectively defendants), executed a written agreement whereby plaintiffs would establish an Iranian corporation in Iran to build a plant in Iran for manufacturing defendants' computer products to be sold in Iran and elsewhere and would provide defendants with 18 percent of the shares of the corporation. Plaintiffs further allege that in reliance on this agreement they expended monies on the project, began setting up the plant, and obtained necessary cooperation from the Government of Iran. According to plaintiffs, defendants ceased doing business in the computer industry, in whole or in part, and decided not to proceed with the agreement. Plaintiffs filed an action for breach of contract seeking their expenditures and antici- pated lost profits as damages. On appeal, plaintiffs waived their right to seek recovery for their out-of-pocket expenses.

The trial court granted defendants' motion for summary judgment on the ground that the alleged agreement is unenforceable as illegal and against public policy in that it violates United States presidential executive orders and implementing regulations, which prohibit, without a license, any "United States person" from engaging in any transaction, either directly or indirectly, that deals in or relates to the exportation, sale or supply of goods, technology or services to Iran or the Government of Iran or any investment in or financing of such transactions.

In affirming the summary judgment, we hold that plaintiffs legally cannot establish their claim because the agreement upon which plaintiffs' claim is based is illegal and against public policy. We also hold that neither the presidential executive orders nor the regulations implementing the orders should be interpreted to preclude defendants from prevailing on their affirmative defense of illegality.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiffs[2] are residents and citizens of the United States. Defendants Tsann Kuen China Enterprise Co., Ltd. and Tsann Kuen Shanghai Enterprise Co., Ltd. are Chinese corporations doing business in China and elsewhere; defendant Tsann Kuen USA, Inc. is a California corporation with its principal place of business in California; defendant Tsann Kuen Enterprise Co., Ltd. is a Taiwanese corporation with offices in California and elsewhere; defendant Eupa International Corp. is a Nevada corporation with its principal place of business in California; defendant Tsann Kuen Enterprise Co., Ltd. owns directly or indirectly the other defendant companies; and the defendant companies use the names "Tsann Kuen" or "Eupa" or variations of those names.

Defendants manufactured computer products and desired to sell notebook computers in Iran, but the high import duties were an impediment. The Islamic Republic of Iran (Iran or Government of Iran) established a "free trade zone" (known as the "Kish Free Trade Zone") in which goods manufactured in that zone received preferential import duty treatment even if the

---

[1] In accordance with the summary judgment standard of review, we state the uncontradicted facts and the reasonable inferences that can be drawn from them. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483].)

[2] Plaintiffs allege that by assignment the claims belong to plaintiffs Nikfarjam and Hassanshahi.

goods utilized some components manufactured outside Iran. According to plaintiffs, they and defendants agreed to establish an Iranian corporation to manufacture notebook computers in the free trade zone and to sell that product in Iran and in neighboring countries. The initial capital of the corporation was to be U.S. $7 million. Under the agreement, defendants would supply necessary resources, including rights for the design, manufacturing, assembling, and sale of its products; arrange for equipment for the Iranian facility; create research and development at the facility; and train plaintiffs' engineers and workers to manufacture the computers at the facility. Defendants were to receive 18 percent of the stock of the corporation ("as long as the agreement between the parties is valid"), while plaintiffs would form the corporation and establish the facility in Iran. As plaintiffs were to transfer to defendants 18 percent of stock of the corporation, at least initially, plaintiffs would necessarily have had all of the outstanding stock of the corporation and have been the controlling shareholders of that entity. Plaintiffs allege that the parties reduced their agreement to writing in a November 28, 2000 "Letter of Intent" (agreement) that provided that the writing was to be binding.[3] Plaintiffs personally planned to manage the company, which was to manufacture and sell the products in Iran and elsewhere. It appears that the Iranian government was involved in the project, for there is correspondence reporting meetings with Iranian government officials. Plaintiffs introduced in evidence an internal memorandum of defendants stating, "[s]ince computers on the Iranian market are now very expensive and heavily taxed, and Americans are not allowed in but they want American technology, they are taking a roundabout route."

Plaintiffs allege that in reliance on the agreement, they invested time and money to carry out their obligations, including creating an Iranian corporation known as "Notebook International Ltd." Plaintiffs contend that they did not, and were not going to, supply or sell from the United States any computer or software materials or technology. Initially, plaintiffs operated Notebook International Ltd. out of California, and they began to arrange for financing either from a Pakistani investor or an Iranian bank, but defendants "decided to pull out of the computer industry entirely or in relevant part [and] decided not to proceed with the November 28, 2001 [sic] contract." Defendant Tsann Kuen China (Shanghai) Enterprise Co., Ltd. conceded it ceased manufacturing computers in 2001. Thus, according to plaintiffs, defendants breached the agreement by terminating it without cause, thereby causing plaintiffs damages in the amounts plaintiffs expended and lost profits.

---

[3] Defendants have taken the position that there was no binding agreement, but that position was not a basis of their summary judgment motion.

Plaintiffs asserted only a cause of action for breach of the agreement and not one for quantum meruit. Defendants moved for summary judgment on the ground that the agreement was illegal and contrary to public policy because it violated Executive Orders Nos. 13059, 62 Federal Register 44531 (Aug. 19, 1997) (Executive Order No. 13059 and Executive Order No. 12959) and 12959, 60 Federal Register 24757 (May 6, 1995) (Orders) and the implementing Iranian Transaction's Regulations (31 C.F.R. §§ 560.101–560.418) (2000) (Regulations).[4] Those Orders and Regulations prohibit any United States person from engaging in any transaction, directly or indirectly, relating to the exportation, reexportation, sale, or supply of goods, technology, or services to Iran or the Government of Iran. The Orders were authorized by, inter alia, the International Emergency Economic Powers Act (50 U.S.C. § 1701 et seq. (IEEPA)), which act provides for civil and criminal penalties for violations of orders promulgated pursuant to that statute. (50 U.S.C. § 1705.)

Defendants contend that California law renders the agreement unenforceable because the agreement has an illegal object and is contrary to law. (Civ. Code, §§ 1441, 1550, 1596, 1598, 1608, 1667, 1668.) Plaintiffs counter that the agreement was legal where executed and where it was to be performed and was capable of being performed in a legal manner; that defendants did not meet their burden to show that a license could not have been obtained from the United States Office of Foreign Asset Control (OFAC) authorizing (even retroactively) the agreement; that the Orders are not intended to confer a private benefit or right of action or defense on a party; and that to the extent the Orders might cover the transaction involved, they are unconstitutionally vague.

The trial court granted defendants' motion for summary judgment and entered judgment. Plaintiffs appealed.

## DISCUSSION

### 1. *Standard of Review*

■ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c,

---

[4] We refer to the Regulations in effect at the time of the transaction in question. There are no changes in the Regulations from 2000 to the present that affect the situation in this case.

subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

■ A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has made such a showing, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 849.) If the plaintiff does not make such a showing, summary judgment in favor of the defendant is appropriate. To obtain a summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . . [T]he defendant need not himself conclusively negate any such element . . . ." (*Id.* at p. 853.)

On appeal from a summary judgment, an appellate court makes "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].) " 'Whether a contract is illegal . . . is a question of law to be determined from the circumstances of each particular case. [Citation.]' " (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126 [131 Cal.Rptr.2d 387]; see also *Kallen v. Delug* (1984) 157 Cal.App.3d 940, 951 [203 Cal.Rptr. 879].)

### 2. *General Principles Regarding Illegal Contracts*

As one authority has noted, "[t]he law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy." (15 Corbin on Contracts (2003) § 79.1, p. 1 (Corbin); see also *Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [216 Cal.Rptr. 412, 702 P.2d 570] [" ' "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out . . . ." ' "]; *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 [308 P.2d 713] ["the courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act"]; Winfield, *Public Policy in the English*

*Common Law* (1928) 42 Harv. L.Rev. 76.) Such agreements are "traditionally referred to as 'illegal contracts,' " even though they "are functionally described as contracts unenforceable on grounds of public policy." (Rest.3d Restitution & Unjust Enrichment (Tent. Draft No. 3, Mar. 22, 2004) § 32, com. a, p. 154 (Tentative Draft).)[5]

■ California statutes require that a contract have "a lawful object." (Civ. Code, § 1550, subd. (3); see Civ. Code, § 1596.) Otherwise the contract is void. (Civ. Code, § 1598.) Civil Code section 1668 provides that a contract that has as its object a violation of law is "against the policy of the law." Civil Code section 1667 states that "unlawful" is "1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals." (See also Civ. Code, §§ 1441 ["A condition in a contract, the fulfillment of which is . . . unlawful . . . is void"], 1608 ["If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void"].) California courts have stated that an illegal contract "may not serve as the foundation of any action, either in law or in equity" (*Tiedje v. Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 453–454 [296 P.2d 554]), and that when the illegality of the contract renders the bargain unenforceable, " '[t]he court will leave them [the parties] where they were when the action was begun' " (*Wells v. Comstock* (1956) 46 Cal.2d 528, 532 [297 P.2d 961]; see also *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 408 [75 Cal.Rptr.2d 257] ["[i]llegal contracts are void"], disapproved on other grounds in *Bonifield v. County of Nevada* (2001) 94 Cal.App.4th 298 [114 Cal.Rptr.2d 207]).

A recent authority states, "It is often asserted that there is a presumption against the availability of restitution in the context of illegal agreements. Courts continue to recite that the law will 'leave the parties to an illegal contract where it finds them.' Neither generalization is accurate, and the better authorities immediately qualify any such statement by acknowledging a lengthy and intricate list of exceptions." (Tent. Draft, *supra*, § 32, com. b, p. 157.) Courts in California have, depending on the facts, carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable. (See, e.g., *Asdourian v. Araj* (1985) 38 Cal.3d 276, 292–294 [211 Cal.Rptr. 703, 696 P.2d 95], superseded on other grounds by Bus. & Prof. Code, § 7031 [illegal contract enforced if defendant would be unjustly enriched or plaintiff would be subject to harsh penalty];

---

[5] The Restatement Second of Contracts states, "This Restatement is concerned with whether a promise is enforceable and not with whether some other sanction has been attached to the act of making or performing it in such a way as to make that act 'illegal.' The rules stated here are therefore formulated in terms of 'unenforceability' rather than 'illegality.' " (Rest.2d Contracts, ch. 8, Topic 1, introductory note, p. 5.) Some suggest that the term "illegal contract" is an oxymoron. (Strong, *The Enforceability of Illegal Contracts* (1961) 12 Hastings L.J. 347.)

*M. Arthur Gensler, Jr., & Associates, Inc. v. Larry Barrett, Inc.* (1972) 7 Cal.3d 695, 702 [103 Cal.Rptr. 247, 499 P.2d 503] (*Gensler*) [illegal contract can be enforced if statutory penalties interpreted to exclude as a sanction nonenforcement of contract]; *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218–220 [45 Cal.Rptr. 878, 404 P.2d 486] [illegal contract may be enforced based on such considerations as whether public cannot be protected because contract terminated, no serious moral turpitude involved, defendant more at fault, and defendant otherwise would be unjustly enriched]; *Lewis & Queen v. N. M. Ball Sons, supra,* 48 Cal.2d at p. 151 [illegal contract enforced if policy better served by enforcement against violating defendant]; *R. M. Sherman Co. v. W. R. Thomason, Inc.* (1987) 191 Cal.App.3d 559, 564 [236 Cal.Rptr. 577] ["Civil Code sections 1598 and 1608 are not always applied literally; in many cases they have simply been overlooked or ignored"]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 451, pp. 401–402; 3 Schwing, Cal. Affirmative Defenses (2d ed. 1996) § 37:6, pp. 22–23 (Schwing); Rest.2d Contracts §§ 178, 179, 180, 181, 182, 183, 198, 199.)[6]

For purposes of illegality, the "law" is a broad term. In this connection, the Restatement Second of Contracts defines the term "legislation" as including "any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them." (Rest.2d Contracts, § 178, com. a, p. 7.)[7]

"A bargain may be illegal because the performance that is bargained for is illegal; and the performance may be illegal because governmental authority has declared it to be a 'crime,' in any one of the multiplicity of degrees. . . . This is true whether the performance bargained for is one that is merely promised, to be rendered in the future, or is one that is rendered as the executed consideration for a return promise. On the other hand, a bargain may be illegal even though no illegal performance is either promised or executed as the consideration for a promise; it may be illegal because the making of such a bargain is itself forbidden and subjected to penalty." (6A Corbin on Contracts (1962) § 1373, p. 2.)

---

[6] These authorities give examples of illegal contracts that can be enforced.

[7] The court in *Della Zoppa v. Della Zoppa* (2001) 86 Cal.App.4th 1144, 1154 [103 Cal.Rptr.2d 901] said that the phrase "express provision of law" in Civil Code section 1667 "clearly refers to a statute." That statement cannot be taken literally. (See, e.g., *Timney v. Lin, supra,* 106 Cal.App.4th at p. 1127 [courts will not enforce contract to perform act prohibited by statute or ordinance]; *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453 [9 Cal.Rptr.3d 693, 84 P.3d 379] [violation of California Rules of Professional Conduct precludes plaintiffs' recovery under agreement, but did not bar claim for quantum meruit].)

■ When, as in this case, the parties have not designated an applicable law, courts have applied the law of the place of contracting or the place of performance in determining the legality of the contract. (See generally 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 57, p. 93, § 58, pp. 93–95; 3 Schwing, *supra*, § 37:1, pp. 3–8.) The Restatement Second of Conflicts of Law provides that the effect of the illegality of a contract upon the rights of the parties under the contract should, in the absence of an effective clause by the parties, be determined by the law of the state with the most significant relationship to the contract. (Rest.2d Conflict of Law, § 202(1), com. c, pp. 645–646; see *Robbins v. Pacific Eastern Corp.* (1937) 8 Cal.2d 241, 272 [65 P.2d 42].) Notwithstanding these general principles, the forum state will not apply the law of another state to enforce a contract if to do so would violate the public policy of the forum state. (*Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 673 [97 Cal.Rptr. 811]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 51, p. 88; 15 Corbin, *supra*, § 79.7, pp. 44–45.) California law includes federal law. (*People ex rel. Happell v. Sischo* (1943) 23 Cal.2d 478, 491 [144 P.2d 785] [Federal law is "the supreme law of the land (U.S. Const., art. VI, sec. 2) to the same extent as though expressly written into every state law"]; 6A Corbin on Contracts, *supra*, § 1374, p. 7 ["Under our Constitution, national law is also the law of every separate State"].) Thus, a violation of federal law is a violation of law for purposes of determining whether or not a contract is unenforceable as contrary to the public policy of California.

### 3. *Iran Sanctions*

For more than two decades following the Iran hostage crisis in 1979,[8] the United States has promulgated various trade sanctions against Iran. On November 14, 1979, President Carter issued the first of a series of orders declaring a national emergency and freezing all Iranian assets subject to the jurisdiction of the United States. (Exec. Order No. 12170, 44 Fed.Reg. 65729 (Nov. 14, 1979).) Although modified in scope, the Iranian Assets Control Regulations remain in effect. In imposing the freeze, the President exercised powers authorized under the IEEPA and the National Emergencies Act (50 U.S.C. § 1601). Thereafter, unilateral trade sanctions were imposed against Iran. Specifically, on April 7, 1980, with certain limited exceptions, the export of goods to Iran was prohibited, and on April 17, 1980, the United States prohibited all imports from Iran, travel by United States citizens to Iran, and payments or transfers of credit, funds, property or interests therein to persons in Iran. (Exec. Order No. 12205, 45 Fed.Reg. 24099 (Apr. 7, 1980); Exec. Order No. 12211, 45 Fed.Reg. 26685 (Apr. 17, 1980).) The Department of the

---

[8] On November 3, 1979, Iranians seized the United States Embassy in Tehran and detained American diplomatic and consular personnel for 444 days.

Treasury through OFAC issued regulations implementing the embargo imposed by Executive Order. (Iranian Assets .Control Regs., 31 C.F.R. Pt. 535 (2003).) As part of the Algiers Accord[9] that ended the hostage crisis, the frozen assets were returned to Iran and certain sanctions against Iran were revoked. (Exec. Orders Nos. 12276–12285, 46 Fed.Reg. 7913–7932 (Jan. 19, 1981); see also Exec. Order No. 12294, 46 Fed.Reg. 14111 (Feb. 24, 1981); 46 Fed.Reg. 14330.) Thereafter, with a few exceptions, until the imposition of certain transaction sanctions in 1987 (Exec. Order No. 12613, 52 Fed. Reg. 41940 (Oct. 29, 1987)), OFAC did not administer restrictions on dealing or trading with Iran. There were other export control regulations that had applied to Iran since 1979, administered under other statutes. (See generally Newcomb, *Office of Foreign Assets Control,* Practising Law Inst. Commercial Law and Prac. Course Handbook Series (Dec. 9–10, 2002), 844 PLI/Comm. 105, 155.) In 1984, the Secretary of State placed Iran on the list of terrorist-supporting countries (49 Fed.Reg. 2836-02 (Jan. 23, 1984)), where it has remained since that time.[10] (22 C.F.R. § 126.1(d) (2003); *Dammarell v. Islamic Republic of Iran* (D.D.C. 2003) 281 F.Supp.2d 105, 112; *Peterson v. Islamic Republic of Iran* (D.D.C. 2003) 264 F.Supp.2d 46, 51, fn. 7.)

On March 15, 1995, President Clinton announced "that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. . . ." (Exec. Order No. 12957, 60 Fed.Reg. 14615 (Mar. 15, 1995).) Invoking the authority of the IEEPA, the President declared a national emergency to deal with that "threat" and banned transactions involving Iranian petroleum resources. Two months later, the President issued Executive Order No. 12959, 60 Federal Register 24757 (May 6, 1995), which bans, among other things, most importation, exportation, and reexportation of goods between the United States and Iran.

One court has described Executive Order No. 12959 as follows: "The order is clothed with the most serious of purposes, and it is couched in the broadest of terms. It prohibits, with only limited exceptions, the exportation 'of *any*

---

[9] Declaration of the Government of the Democratic and Popular Republic of Algeria (19 Jan. 1981), reprinted in 20 I.L.M. 224 (1981), and in 1 Iran-U.S. Claims Tribunal Reports (1981) 3-8 and the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (19 Jan. 1981) reprinted in 20 I.L.M. 230 (1981), and in 1 Iran-U.S. Claims Tribunal Reports (1981) 9-12, and related technical implementing agreements; see Brower & Brueschke, The Iran-United States Claims Tribunal (1998) 1-10; Christopher, Chances of a Lifetime (2001) 96-123; Christopher et al., American Hostages in Iran: the conduct of a crisis (Yale Univ. Press 1985).

[10] States are designated as "terrorist" under the Export Administration Act of 1979, section 6(j) (50 U.S.C. App. § 2405(j)), or under the Foreign Assistance Act of 1961, section 620A (22 U.S.C. § 2371).

goods, technology . . . , or services,' the reexportation 'of *any* goods or technology,' the entering into '*any* transaction . . . by a United States person relating to goods or services of Iranian origin,' and '*any* new investment by a United States person in Iran.' [Citation.] Moreover, it bars '*any* transaction . . . that evades or avoids' its restrictions. [Citation.] The obvious purpose of the order is to isolate Iran from trade with the United States. [¶] Consistent with the plain meaning of the term 'export,' the Executive Order intended to cut off the shipment of goods intended for Iran. . . . See Message to Congress on Iran, 31 *Weekly Comp. Pres. Doc.* 1584 (Sept. 25, 1995)." (*United States v. Ehsan* (4th Cir. 1998) 163 F.3d 855, 859; see also U.S. Dept. of State Dispatch No. 387 (May 8, 1995) 1995 WL 8643549 [Secretary of State Warren Christopher states "executive order will ban all U.S. trade and investment with Iran"]; *Transfair Intern., Inc. v. United States* (2002) 54 Fed.Cl. 78, 80–81.)

On August 19, 1997, the President issued Executive Order No. 13059, 62 Federal Register 44531 (Aug. 19, 1997), restating and expanding the embargo to include all exportation and reexportation, direct and indirect, with the specific destination of Iran (64 Fed.Reg. 20168-01 (Apr. 26, 1999)). Executive Order Nos. 12959 and 13059 both state that they are "in response to actions of the Government of Iran occurring after the conclusion of the 1981 Algiers Accords, and are intended solely as a response to those later actions." (Exec. Order No. 12959, 60 Fed.Reg. 24757 (May 6, 1995) § 7; Exec. Order No. 13059, 62 Fed.Reg. 44531 (Aug. 19, 1997), § 9.)

To implement these Orders, OFAC promulgated the Iranian Transactions Regulations (31 C.F.R. Pt. 560 (2003)). The Regulations, which were in effect at the time of the transaction at issue and which track the Orders, prohibit, inter alia, the following: "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person [deemed to be any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States], wherever located, of any goods, technology, or services to Iran or the Government of Iran" (31 C.F.R. § 560.204); any "United States person, wherever located," "engag[ing] in any transaction or dealing [transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing (31 C.F.R. § 560.206(b))] in or related to: . . . Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran" (31 C.F.R. § 560.206(a)); "new investment ['constitutes: [¶] (a) A commitment or contribution of funds or other assets; or [¶] (b) A loan or other extension of credit, as defined in § 560.317' (31 C.F.R. § 560.316)] by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran" (31 C.F.R. § 560.207).

The Regulations state that "no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States." (31 C.F.R. § 560.208.) A "prohibited facilitation or approval of a transaction by a foreign person" is defined to include, among other activities, referral "to a foreign person purchase orders, requests for bids, or similar business opportunities involving Iran or the Government of Iran to which the United States person could not directly respond as a result of the prohibitions contained in this part." (31 C.F.R. § 560.417(b).) The Regulations further provide: "The prohibition on the exportation, reexportation, sale or supply of services contained in § 560.204 applies to services performed on behalf of a person in Iran or the Government of Iran or where the benefit of such services is otherwise received in Iran . . . . [(31 C.F.R. § 560.410(a).)] [A United States person may not]: (1) Act as broker for the provision of goods, services or technology, from whatever source, to or from Iran or the Government of Iran . . . ; [¶] . . . [¶] (4) Act as a broker for the provision of financing, a financial guarantee or an extension of credit to any person specifically to enable that person to construct or operate a facility in Iran or owned or controlled by the Government of Iran; or [¶] (5) Act as a broker for the provision of financing, a financial guarantee, or an extension of credit to any person specifically to enable that person to provide goods, services, or technology intended for Iran or the Government of Iran." (31 C.F.R. § 560.416(b)(1), (4), (5).)

As noted above, violations of the Regulations are subject to civil and criminal penalties. (50 U.S.C. § 1705.) Title 18 United States Code section 2332d, enacted in 1996, makes it a crime for a United States person to engage in financial transactions with governments of countries designated as supporting international terrorism, and Iran has been designated as one of those countries.[11] Also, under the Iran and Libya Sanctions Act of 1996 (Pub.L. No. 104-72 (Aug. 5, 1996) 110 Stat. 1541) the President may sanction domestic and foreign companies investing in or trading with Iran. (See also 22 U.S.C. § 7207 [no United States assistance for exports to Iran].)

■ The Regulations provide only two ways to avoid the prohibitions on dealing with Iran: coverage under a general license authorizing certain categories of transactions (see 31 C.F.R. §§ 501.801(a) (2003), 560.311, 560.505–560.535; 31 C.F.R. §§ 501.801(b), 560.312)[12] and issuance of a specific license. The Regulations state that prohibited transactions "which are

---

[11] See footnote 10, ante.

[12] General licenses authorizing certain humanitarian activities in and around Iraq (31 C.F.R. § 560.536 (2003)) and certain survey or assessment missions in Iran (31 C.F.R. § 560.537 (2003)) were issued after the transaction at issue in this case.

not authorized by general license may be effected only under specific licenses." (31 C.F.R. § 501.801(b).)

■ General licenses authorizing certain types of transactions with Iran are set forth in subpart E of the Regulations. (31 C.F.R. §§ 501.801, 560.505–560.535.) A person does not need to apply for a general license because the Regulations themselves authorize the covered transactions. (U.S. Dept. of Treas., Off. of Foreign Assets Control, *Frequently Asked Questions* <http://www.ustreas.gov/offices/eotffc/ofac/faq/index.html # license> [as of May 6, 2004] (OFAC Frequently Asked Questions).) Persons availing themselves of certain general licenses may be required to file reports and statements in accordance with instructions specified in those licenses. (31 C.F.R. § 501.801(a).) Exportation of goods or technology for incorporation into an end product within Iran (as apparently contemplated by the parties here) is not covered by any general license set forth in the Regulations. Plaintiffs do not contend that the transaction here is covered by a general license.

■ A specific license is a document issued by OFAC, upon application, authorizing a particular transaction to a particular person or entity. (31 C.F.R. § 501.801(b).) There is no formal process of appeal from a denial of a license application. "Many of OFAC's licensing determinations are guided by U.S. foreign and national security concerns. Numerous issues often must be coordinated with the U.S. Department of State and other government agencies, such as the U.S. Department of Commerce." (OFAC Frequently Asked Questions, *supra.*)

### 4. *The Parties' Agreement Violates the Law*

The agreement at issue is prohibited by the Orders and Regulations, as is the performance promised and rendered by plaintiffs. Plaintiffs are United States citizens who reside in California, and they are therefore "United States person[s]" as defined by the Orders. (Exec. Order No. 13059, 62 Fed.Reg. 44531 (Aug. 19, 1997) § 4(c); 31 C.F.R. § 560.314.) The express purposes of the agreement were to supply goods, technology, and services to Iran and even to sell products to the Government of Iran. These purposes violate the Orders and Regulations. (Exec. Order No. 13059, 62 Fed.Reg. 44531 (Aug. 19, 1997) § 2(a), (d); 31 C.F.R. § 560.204.) Plaintiffs do not contend that they had obtained authorization for their activities pursuant to any specific license.

By entering into the contract, plaintiffs "approve[d]" and "facilitate[d]" a prohibited transaction, acts barred by the Regulations. (31 C.F.R. § 560.206.) That the agreement was signed in China or called for performance in Iran does not avoid the clear prohibitions of the Orders and Regulations. Similarly,

that the agreement does not specify the source of funding is likewise irrelevant. The agreement specifically states that plaintiffs are to be involved in the manufacture of products in Iran and have a majority of the shares of the Iranian corporation that plaintiffs are establishing to engage in the manufacture and sale of computer products in Iran.

██ Plaintiffs' actual and anticipated performance under the agreement were likewise prohibited. Plaintiffs allege that they "traveled to Iran to begin setting up the plant" and "secured the necessary governmental cooperation." Plaintiffs further allege that pursuant to the agreement "they invested considerable funds, time and resources into the project to find the land, plan the facility, and other expensive preparations . . . [and] make certain commitments, including [with] the government [of Iran] . . . ." These activities, done in furtherance of the agreement to supply goods, technology and services to Iran, were all prohibited. (Exec. Order No. 13059, 62 Fed.Reg. 44531 (Aug. 19, 1997) § 2(a)(i), (e); 31 C.F.R. § 560.206(b) ["*transaction or dealing* includes . . . facilitating," italics added].) The agreement and plaintiffs' performance of that agreement are in clear violation of the Orders and Regulations,[13] and therefore of the implementing statute. (50 U.S.C. § 1701 et seq.)

## 5. *Availability of License and Legal Performance*

Relying upon the general rule that a contract must be construed so as to give it a legal effect if possible under the circumstances (Civ. Code, §§ 1643 ["A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties"], 3541 ["An interpretation which gives effect is preferred to one which makes void"]), plaintiffs contend that the availability of a specific license to avoid the prohibitions of the Orders and Regulations precludes refusing to enforce the agreement on the ground of illegality. Plaintiffs also point to the language in the Regulations that states that the prohibitions apply "[e]xcept as otherwise authorized pursuant to this part" (31 C.F.R. § 560.204), and to the licensing provisions in subpart E, which provide that "[n]o license or other authorization contained in this part, or otherwise issued by or under the direction of the Director of the Office of Foreign Assets Control, authorizes or validates any transaction effected prior to the issuance of the license, *unless specifically provided in such license or other authorization*." (31 C.F.R. § 560.501(a), italics added.) Plaintiffs contend that these provisions make it possible for them to obtain a specific license that would not only validate the obligations

---

[13] Plaintiffs may have been aware of this possibility by providing in the agreement, "as long as the agreement between the parties is valid."

of the agreement but also grant retroactive authorization for the agreement itself and the performance rendered under the agreement.

It is true that "[a]s a general rule, if a contract can be performed legally, a court will presume that the parties intended a lawful mode of performance." (*Redke v. Silvertrust* (1971) 6 Cal.3d 94, 102 [98 Cal.Rptr. 293, 490 P.2d 805]; see *West Covina Enterprises, Inc. v. Chalmers* (1958) 49 Cal.2d 754, 759 [322 P.2d 13].) As one court has noted, "Many contracts cannot lawfully be performed without securing a permit, license, or approval from some governmental officer or board, and yet the contracts are not deemed illegal." (*Nussenbaum v. Chambers & Chambers* (1948) 322 Mass. 419 [77 N.E.2d 780, 782–783], quoted in 8 Williston on Contracts (4th ed. 1998) § 19:61, p. 517.) Citing this Massachusetts case, the California Supreme Court stated, "[t]he requirement of government approval for performance of a contract does not invalidate a lawful contract. [Citation.]" (*Alpha Beta Food Markets v. Retail Clerks* (1955) 45 Cal.2d 764, 772 [291 P.2d 433] [wage control laws intended to curb inflation, while in effect, did not require wage board approval to validate parties' collective bargaining agreement when payments under agreement lawfully could be made without such approval after wage controls were terminated]; see 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 452, pp. 402–404; *Lewis & Queen v. N.M. Ball Sons, supra*, 48 Cal.2d at pp. 147–148.)

There are many different types of legally required licenses, certificates, registrations, and other governmental approvals necessary for engaging in business and professional activities. These provisions vary as to their purposes and sanctions. Agreements between parties may expressly or impliedly be conditioned upon obtaining government approval or require one party to obtain government approval as part of its performance under the contract. "The fact that a party agrees to do an act which will be illegal unless governmental permission is obtained does not make such an agreement illegal, and a party that does not obtain such permission may be held responsible in damages for his failure to perform the agreement." (8 Williston on Contracts, *supra*, § 19:61, pp. 516–517.)

There are, however, various situations in which the failure to obtain governmental approval renders a contract illegal and unenforceable in conformity with the general rule that a court will not enforce an illegal contract or provide for compensation for an illegal act. (*Lewis & Queen v. N.M. Ball Sons, supra*, 48 Cal.2d at pp. 148–149.) For example in *Lawn v. Camino Heights, Inc.* (1971) 15 Cal.App.3d 973, 979 [93 Cal.Rptr. 621] (*Lawn*), the court said "[s]ince no permit had been obtained from the Commissioner of Corporations at the time the agreement for such payment was made, defendant corporation's promise to compensate plaintiff in that manner was illegal

and unenforceable even though the parties may have intended to obtain a permit before the stock was issued." In that case, the statute expressly prohibited contracting without obtaining the permit.

The Restatement Second of Contracts provides in section 181: "If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if [¶] (a) the requirement has a regulatory purpose, and [¶] (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement." According to Corbin, "[c]ourts often analyze the enforceability of a contract in this manner." (15 Corbin, *supra*, § 88.1, p. 570.) "Modern courts . . . balance the regulatory interest behind the licensing statute against the interest in enforcing the contract." (*Id.*; see *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246, 254–255, 262 [48 Cal.Rptr.2d 437].)

The Orders and Regulations here are regulating in nature and involve national security. (See *United States v. Ehsan, supra,* 163 F.3d at p. 859.) No one could seriously contend that enforcement of the agreement in question is not outweighed by the public policy behind the governmental provisions. (See Tent. Draft, *supra,* com. c, pp. 159–160 ["Significant negative consequences for deterrence will justify the court in denying relief, even in the face of substantial unjust enrichment"].)

■ Moreover, the applicable provisions are comparable to the requirement in *Lawn, supra,* 15 Cal.App.3d 973, that a license be obtained before contracting. The context of the Regulations as a whole and the stated purpose and intent of the Orders and Regulations are that issuance of a specific license is a prerequisite to engaging in any prohibited transaction, including entering into a contract concerning a prohibited transaction. The licensing provisions of the Regulations state: "Transactions subject to the prohibitions contained in this chapter, or to prohibitions the implementation and administration of which have been delegated to the Director of the Office of Foreign Assets Control, which are not authorized by general license may be effected *only* under specific licenses." (31 C.F.R. § 501.801(b), italics added.) Thus, transactions that are not authorized by a general license cannot be operative legally absent the issuance of a specific license. (*Inter Valley Health Plan v. Blue Cross/Blue Shield* (1993) 16 Cal.App.4th 60, 69 [19 Cal.Rptr.2d 782] [in determining intent of lawmakers, a court looks first to words of provision, giving them their usual and ordinary meaning, and administrative regulations are subject to the same rules].) Entry into and performance of the contract at issue here were not authorized by any general license and could be fulfilled legally only by obtaining a specific license, which was not done.

Unlike many licensing provisions, granting a specific license under the Regulations is not based on meeting certain specified qualifications or requirements. As noted above, the licensing determinations "are guided by U.S. foreign and national security concerns." (OFAC Frequently Asked Questions, *supra.*) To proceed with a prohibited transaction without a license necessarily risks conflicting with "U.S. foreign and national security concerns."

That a license may be obtained after the agreement was entered into and that it is theoretically possible that the transaction effected prior to the issuance of the license can be validated (31 C.F.R. § 560.501(a)), may be factors in "balanc[ing] the regulatory interest behind the licensing statute against the interest in enforcing the contract." (15 Corbin, *supra*, § 88.1, p. 570; see Rest.2d Contracts, § 178(2), (3);[14] *Transfair Intern., Inc. v. United States, supra*, 54 Fed.Cl. at pp. 80–82.) In this case, the regulatory interests far outweigh any interest in enforcing the agreement. Once the technology and product are provided to those in Iran, the anticipated harm intended to be prevented has occurred. That a license might theoretically be obtained thereafter cannot undo that harm. Moreover, there is no evidence that the parties contemplated obtaining a license. The agreement does not impose this requirement, and there is no evidence that plaintiffs ever applied for a license.

Plaintiffs rely upon *Gardiner v. Burket* (1935) 3 Cal.App.2d 666 [40 P.2d 279], a case that is distinguishable. *Gardiner* involved an oral contract to remove a building, which was done without a necessary permit. The court did not invalidate the contract because a permit could have been obtained. Here, unlike the oral agreement in *Gardiner*, the written contract was itself illegal.

Plaintiffs assert that the burden rests upon defendants to show that plaintiffs could not obtain a license. But with no license, the contract and performance under the contract are illegal. Indeed, there have been successful criminal prosecutions for violations of the Regulations, notwithstanding theoretical availability of a license that might retroactively authorize a prohibited act.

---

[14] Restatement Second of Contracts, section 178, comment b, states, "Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability . . . . In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms."

(See, e.g., *United States v. Ehsan, supra,* 163 F.3d at p. 859; *United States v. Hescorp, Heavy Equipment Sales Corp.* (2nd Cir. 1986) 801 F.2d 70.) It is plaintiffs' burden to show not only that the transaction is licensed but that any license obtained after the transaction was effected cured the illegal activity that has occurred. We need not determine the effect of a showing that one could obtain a license that would validate prospectively and retroactively the transaction because plaintiffs have not made such a showing here. Plaintiffs' submission suggesting that others may have obtained licenses for transactions in Iran is not persuasive because even if one could draw an inference from past licenses granted that a license would be granted in a specific case, the examples given do not involve transactions comparable to that in the instant case, and there is no indication of when those alleged licenses were given or the circumstances existing at the time of the alleged licenses.

 There is another reason that plaintiffs cannot avail themselves of the general principle that if a contract can be performed in a legal manner it is not void. This principle "does not apply where the one seeking to enforce the contract participates in the illegal performance." (*Platt v. Wells Fargo Bank* (1963) 222 Cal.App.2d 658, 666 [35 Cal.Rptr. 377].) Plaintiffs' illegal performance precludes them from relying on the possibility of a license to validate their illegal conduct.

### 6. *Effect of No Creation of Right or Benefit Provision*

Plaintiffs contend that provisions in the Orders that state that "[n]othing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person" (Exec. Order No. 13059, § 8; Exec. Order No. 12959, § 6) preclude defendants from relying on the Orders as the basis for the affirmative defense of illegality. That language, or similar language, has appeared in many relatively recent presidential orders. (See, e.g., Exec. Order No. 12600, § 10, 52 Fed.Reg. 23781 (June 23, 1987) ["This Order is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person"]; Exec. Order No. 12989, § 9, 61 Fed.Reg. 6091 (Feb. 13, 1996) ["This order is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or its employees"]; Exec. Order No. 12788, § 6, 57 Fed.Reg. 2213 (Jan. 15, 1992) ["This order shall not be interpreted to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, its agents, or any person"].)

There is no specific indication in these Orders of why that language is included. An obvious goal was to ensure that nothing in the Orders would provide a potential claim against the United States or its officers. In the instances when the phrase "or any other person" was added, it would appear that the intent was to preclude any implied cause of action, even though Congress and the President must show an intent to create such a cause of action for there to be one.[15]

Nevertheless, it appears that the President, in his Orders, took the precaution to preclude the possibility that anyone could construe the Orders as creating any possible right of action or benefit. There is no indication, however, that by doing so, the President sought to supersede other laws or displace state law. (See *Betancourt v. Storke Housing Investors* (2003) 31 Cal.4th 1157, 1167–1168 [8 Cal.Rptr.3d 259, 82 P.3d 286] [no federal preemption of " 'traditional state regulation' " unless that was the " 'clear and manifest purpose of Congress' "].)

To conclude that the President intended to preclude any civil consequence of the Orders would lead to far-reaching and absurd results. For example, to read the Orders to preclude any "right or benefit" that arose from any other law would mean that a party could not rely upon the Orders for purposes of invoking such traditional contract principles as impossibility, impracticality, frustration, force majeure, and unclean hands. (See, e.g., Civ. Code, §§ 1441, 1511; *Queens Office Tower Associates v. Iran Air* (1983) 2 Iran-U.S. Tribunal Rep. 247 [Iran asset regulation provides frustration or impossibility defense].[16]) Under plaintiffs' theory, the Orders could not even be used for purposes of interpreting a contract—e.g., in determining that a contract could be performed legally, as argued by plaintiffs.

---

[15] "To assert a judicially enforceable private cause of action directly under an executive order, a plaintiff must show (1) that the President issued the order pursuant to a statutory mandate or delegation of authority from Congress, and therefore the order had the force and effect of law, and (2) that the order's terms and purpose evidenced an intent to create a private right of action. *Independent Meat Packers Association v. Butz*, 526 F.2d 228, 234–35 (8th Cir. 1975). In the absence of such a delegation of authority or mandate from Congress, the President may not act as a lawmaker on his own. *Youngstown Sheet & Tube Co. v. Sawyer* [(1952)] 343 U.S. 579, 587–89 [96 L.Ed. 1153, 72 S.Ct. 863, 62 OhioLawAbs. 417]." (*Centola v. Potter* (D.Mass. 2002) 183 F.Supp.2d 403, 413 (*Centola*); see *Transamerica Mortgage Advisors, Inc. v. Lewis* (1979) 444 U.S. 11 [62 L.Ed.2d 146, 100 S.Ct. 242] [whether statute creates an implied cause of action is determined by whether Congress intended to create a private remedy]; *Phonetel Technologies v. Network Enhanced Telecom* (E.D.Tex. 2002) 197 F.Supp.2d 720, 722, fn. 1 [questioned whether President by order or OFAC by regulations, without a specific statutory delegation of authority, can provide a cause of action because Article III, Section 2 of the Constitution "bestows upon Congress the authority to confer some or all of the judicial power upon the inferior federal courts"].)

[16] Judge Howard Holtzmann dissented on the ground that Iran should not benefit from a situation it created and that caused the promulgation of the regulation. (*Queens Office Tower Associates v. Iran Air, supra*, 2 Iran-U.S. Tribunal Rep. at p. 254.)

 The only logical reading of the provisions in the Orders concerning rights or benefits is that the Orders themselves cannot form the basis of a claim or defense. Here, defendants rely on state law principles of illegality; that illegality is based on a violation of the Orders and Regulations. It is not the Orders or Regulations that provide the affirmative defense. It is state law.

The cases cited by plaintiffs in support of their interpretation are distinguishable. In *Centola, supra,* 183 F.Supp.2d at page 413, the plaintiff asserted "a private cause of action *directly* under Executive Orders 13,087 and 11,478," which orders provide that "it is the policy of the Government of the United States . . . to prohibit discrimination in employment" and that the policy is applicable to the United States Postal Service. (Italics added.) "Section 11 of Executive Order No. 11478, states, '[t]his Executive Order does not confer any right or benefit enforceable in law or equity against the United States or its representatives.' " (*Id.* at p. 413) The court held that *by themselves*, these executive orders "do not create a judicially enforceable private right of action for Centola." (*Id.* at pp. 413–414, italics added.) Here, defendants' affirmative defense does not arise "directly" under the Orders and does not invoke the Orders "by themselves." Instead, the affirmative defense is one of illegality under state law, which illegality is, in turn, based on a violation of the Orders.

In *Brug v. National Coalition for Homeless* (D.D.C. 1999) 45 F.Supp.2d 33, the court held that there was no private right of action under Executive Order No. 11246 (antidiscrimination provision) because it does not provide for one. Again, here defendants do not assert a defense based on the order itself. In *Resolution Trust Corp. v. Scaletty* (D.Kan. 1992) 810 F.Supp. 1505, a defendant in a case brought by the Resolution Trust Corporation (RTC) asserted as an affirmative defense the violation by the RTC of an executive order requiring federal agencies in litigation to attempt to achieve compromise and settlement prior to filing suit. That regulation stated that its provisions should not be construed to create a defense on the part of any party. Thus, a party could not preclude a claim against it by asserting that a government agency had failed to attempt to achieve a compromise first. Here, the defense is not that there was a violation of any purported prerequisite imposed by an order for filing a suit. Rather, the affirmative defense is based on the effect under state law of a violation of an order.

### 7. The Inapplicability of Arbitration Cases

Plaintiffs rely on the unpublished case of *MGM Productions Group, Inc. v. Aeroflot Russian Airlines* (S.D.N.Y. May 14, 2003) 2003 U.S. Dist. LEXIS 8174, 2003 WL 2108367 (*MGM*) as support for their position that the Orders and Regulations did not make the transaction unenforceable here. That case is distinguishable.

In *MGM, supra,* 2003 U.S. Dist. LEXIS 8174, petitioner's assignor, a United States citizen, rendered consulting services to the Russian airline company, Aeroflot, in connection with leasing aircraft equipment to Iran Air—an Iranian governmental entity. Aeroflot refused to pay for the services and, pursuant to the agreement with petitioner's assignor, commenced an arbitration in Stockholm, Sweden under the laws of the State of New York and Russia. Aeroflot argued, inter alia, that it need not pay anything because the contract was illegal under the same Orders and Regulations at issue in the instant case. The arbitration panel held that the transaction did not violate the Orders or Regulations. Plaintiff successfully sought to confirm the award in a United States District Court pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, title 9 United States Code section 201 et seq. (the New York Convention). The court agreed with the arbitral panel that the agreement did not violate the Orders or Regulations. The arbitral panel had concluded that the services in question were to Aeroflot and not to any entity in Iran.[17] The court said that even if the agreement did violate the Orders and Regulations, that would not be grounds under the New York Convention for a refusing to confirm an award because the public policy defense under the New York Convention to enforcement of an arbitral award applies "only where enforcement would violate the forum's state's 'most basic notions of morality and justice.' " (*MGM, supra,* 2003 U.S. Dist. LEXIS 8174.)

The court, in effect, distinguished between public policy as contemplated by article 5 of the New York Convention as a ground not to enforce a foreign arbitral award and national public policy that might cause a domestic court to consider a contract illegal. There is an "important *distinction between domestic and international public policy . . .* According to this distinction what is considered to pertain to public policy in domestic relations does not necessarily pertain to public policy in international relations. . . . [¶] Considering the legislative history of Article V(2)(b), the [New York] Convention can be said to refer to 'international public policy' as distinct from 'domestic public policy.' " (van den Berg, The New York Arbitration Convention of 1958 (1981) 360–361; see *Parsons & Wh. Ov. Co., Inc. v. Societe G. de L. du P. (R.)* (2d Cir. 1974) 508 F.2d 969, 974 [requiring "supranational emphasis" rather than reliance on "national political interests"].) Even if courts do not distinguish between international public interest and domestic public interest, courts "have adopted very narrow views of article V(2)(b)'s [New York Convention] public policy exception." (Born, International Commercial Arbitration (2d ed. 2001) 825; see *Fotochrome, Inc. v. Copal Company, Limited*

---

[17] In the instant case, plaintiffs were to establish an entity in Iran.

(2nd Cir. 1975) 517 F.2d 512, 516 ["the 'public policy' limitation on the Convention is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice"].)[18] Accordingly, arbitration enforcement cases arising under the New York Convention are not determinative of judicial treatment of contracts that violate law.

### 8. *Orders and Regulations Not Unconstitutionally Vague*

Plaintiffs' argument that the prohibition of "facilitation" or "evasion" specified in the Orders and Regulations renders those Orders and Regulations unconstitutionally vague is not supported by applicable case law. Plaintiffs cite the unpublished case of *Looper v. Morgan (Dept. of Treasury)* 1995 U.S. Dist. LEXIS 10241 (S.D.Tex. June 23, 1995) (*Looper*) that said that a provision in a presidential order barring "evasion" of the prohibition of transactions with Libya was too vague. In that case, the court ruled that OFAC could not defeat the attorney-client privilege and review papers of an attorney returning to the United States whose clients were suspected of doing business on behalf of the sanctioned Libyan government. The court held that the activities were not covered by the applicable regulations. (See Lehrer, *Unbalancing the Terrorists' Checkbook: Analysis of U.S. Policy in its Economic War on International Terrorism* (2002) 10 Tul. J. Internat. Comp. L. 333, 343 [discussing *Looper* case but noting judicial deference toward OFAC regulations and licensing procedure, and referring to *Looper* as "one of the few critical opinions of OFAC" (at p. 343, fn. 79)]; Marcuss, *Grist for the Litigation Mill in U.S. Economic Sanctions Programs* (1999) 30 Law & Policy Internat. Bus. 501, 518–520 [discussing *Looper* case].) Here plaintiffs' activities are clearly covered by the applicable regulations.

Moreover, courts have upheld the validity of the use of such statutory words as "facilitate" against contentions that the words are unconstitutionally vague. (See, e.g., *United States v. Two Tracts of Real Property* (4th Cir. 1993) 998 F.2d 204, 210 ["use or facilitation" language as interpreted held not unconstitutionally vague]; *Turf Center, Inc. v. United States* (9th Cir. 1963) 325 F.2d 793, 795 [the words "facilitate" and "involving" not unconstitutionally vague]; *United States v. Smith* (E.D.Ill. 1962) 209 F.Supp. 907, 918 ["The words 'promote,' 'manage,' 'establish,' 'carry on' or 'facilitate the promotion, management, establishment or carrying on' are words which have a general meaning, and no serious argument can be presented by which it may be successfully contended that these words are either vague or ambiguous or have some obscure meaning"]; see also *United States v. Hescorp,*

---

[18] As this case does not involve an arbitral award, we do not have to decide enforceability under the New York Convention and whether under that Convention, the violation of the Orders and Regulations should, in a United States court, be considered contrary to international public policy.

*Heavy Equipment Sales Corp., supra*, 801 F.2d at pp. 70, 77 [in connection with the term "service contract," "the Executive Order and the Regulations gave Hescorp fair notice that its intended shipments to Iran were prohibited" so as not to be unconstitutionally vague].) Thus, the language to which plaintiffs object do not cause the Orders and Regulations to be unconstitutional.

### 9. *No Other Grounds For Enforceability*

"Although the courts generally will not enforce an illegal contract, in some cases the statute making the conduct illegal, in providing for a fine or administrative discipline, excludes by implication the additional penalty involved in holding the illegal contract unenforceable [citation]. Sometimes the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. 'In each such case, how the aims of policy can best be achieved depends on *the kinds of illegality and the particular facts involved.*' [Citation.]" (*Gensler, supra*, 7 Cal.3d at pp. 702–703.) Even if a determination of enforceability of patently illegal contracts can be based on the particular facts, plaintiffs have not established any basis for departing from the practice of courts generally not to enforce a contract in violation of law. (*Asdourian v. Araj, supra*, 38 Cal.3d at p. 291; see *Waisbren v. Peppercorn Productions, Inc., supra*, 41 Cal.App.4th at p. 261, quoting *Severance v. Knight-Counihan Co.* (1947) 29 Cal.2d 561, 568 [177 P.2d 4].)

■ An agreement in violation of trade restrictions promulgated for national security reasons and therefore for the purposes of protecting the public should be unenforceable. The penalty is not disproportionate to the severity of the offense, and any "forfeiture" is not unfair. Plaintiffs now only seek lost profits—not restitution of monies or consideration paid to defendants. There is no allegation that any benefit was conferred on or retained by defendants, that defendants have been unjustly enriched, or that any joint venture between plaintiffs and defendants retains monies that could be disbursed to the joint venturers.[19] Moreover, plaintiffs knew they were dealing with Iran and even provided for the possibility of the agreement not being valid.[20]

---

[19] In order for there to be the possibility of restitution, there must be unjust enrichment or the likelihood of unjust enrichment. (Tent. Draft, *supra*, § 32, p. 154, com. a, p. 155.) Although some courts have allowed an accounting of a partnership "pursuing ends contrary to law" (15 Corbin, *supra*, § 89.12, pp. 669–673), they do not always do so. (See *Chateau v. Singla* (1896) 114 Cal. 91 [45 P. 1015] [partnership to rent apartments to prostitutes].)

[20] *Transfair Intern., Inc. v. United States, supra*, 54 Fed.Cl. 78, is far different. The government refused to pay a contractor for transporting humanitarian relief supplies to Ethiopia because a subcontractor used an Iranian carrier to transport the supplies. The

Effective deterrence of violations of the Regulations will result from the refusal to enforce the agreement—not from enforcing the plaintiffs' claim. Defendants are no more at fault in entering into the transaction than plaintiffs. Defendants' breach of the agreement prior to full performance before the project became operational and the unlikelihood that it will ever be performed should have no bearing on the enforceability of the agreement, for generally the issue of enforceability of an illegal contract only arises in a claim of breach of contract. Conduct in violation of the Orders and Regulations has already taken place. The agreement itself involves such serious ramifications, including national security, that allowing plaintiffs damages for a breach of an illegal contract would be inconsistent with the rationale for the doctrine of unenforceability of illegal contracts: "Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place." (*Lewis & Queen v. N. M. Ball Sons, supra,* 48 Cal.2d at p. 150.)

It is not reasonable to infer from the Orders, Regulations, and IEEPA that Congress or the President intended that civil and penal sanctions would exclude any additional deterrent, such as unenforceability of a contract. Corbin states, "[s]tatutes seldom express any intention regarding the enforceability of contracts in so many words. One discovers the supposed intention of the legislature by inference from the purposes of the statute, the evils and harms involved in noncompliance, and the cruelty of enforcing heavy forfeitures against one whose offense may not be very serious." (15 Corbin, *supra,* § 88.2, p. 573.) In this weighing process, Corbin points to section 181 of the Restatement Second of Contracts.[21] Thus, cases have enforced contracts that involve technical violations of occupational licensing and building permit laws (see, e.g., *Felix v. Zlotoff* (1979) 90 Cal.App.3d 155, 162–163 [153 Cal.Rptr. 301]; *Vitek, Inc. v. Alvarado Ice Palace, Inc.* (1973) 34 Cal.App.3d 586 [110 Cal.Rptr. 86], superseded by Bus. & Prof. Code, § 7031, subd. (d); 3 Schwing, *supra,* § 37:6, pp. 22–23), revenue raising provisions, or "when the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another." (*Lewis & Queen v. N. M. Ball Sons, supra,* 48 Cal.2d at p. 153 ["a member of the protected class may maintain an action notwithstanding the fact that he

contractor did not know that the subcontractor was to use Iranian aircraft. Under these circumstances, the court held that the contractor was not responsible for the acts of the subcontractor and that any illegality should not result in a forfeiture.

[21] "If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if [¶] (a) the requirement has a regulatory purpose, and [¶] (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement."

has shared in the illegal transaction"]; see *Yuba Cypress Housing Partners, Ltd. v. Area Developers* (2002) 98 Cal.App.4th 1077, 1082 [120 Cal.Rptr.2d 273].)

 None of those considerations is present in the instant case. Here, the provisions violated are not revenue raising but regulatory in nature—to protect the interests of the United States. Plaintiffs are not part of any protected class. The violations of the Regulations are not mere technicalities with no consequence. Rather, violations of the Regulations are considered to be contrary to the security interests of the United States. The President issued the Orders "to deal with [Iran's] unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." (Exec. Order No. 12959, 60 Fed.Reg. 24757 (May 6, 1995).) Thus, none of the possible "exceptions and qualifications" (*R. M. Sherman Co. v. W.R. Thomason, Inc., supra,* 191 Cal.App.3d at p. 564) to the rule precluding unenforceability of illegal contracts and compensation for illegal performance is applicable in this case.

## CONCLUSION

Plaintiffs' claim is based on an agreement that violates a law and is contrary to California public policy. Accordingly, as a matter of law, plaintiffs may not recover damages for any breach of that agreement.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs of appeal.

Grignon, Acting P. J., and Armstrong, J., concurred.