Filed 5/24/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SEDA GALSTIAN AGHAIAN et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> SHAHEN MINASSIAN, <br><br> Defendant and Appellant. | B296287 <br><br> (Los Angeles County <br> Super. Ct. No. BC498691) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  William MacLaughlin, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup and Allison A. Arabian Hill; Joshua R. Furman Law Corporation and Joshua R. Furman for Defendant and Appellant.

Horvitz & Levy LLP, Mitchell C. Tilner and Steven S. Fleischman; Aldisert Law, Gregory J. Aldisert, Kinsella Weitzman Iser Kump and David W. Swift for Plaintiffs and Respondents.

_____

Seda Galstian Aghaian and Aida Galstian Norhadian (together, Plaintiffs) brought an action against Shahen Minassian,[1] alleging he improperly obtained money and property from their deceased parents.  Following a bench trial, the court concluded Minassian was unjustly enriched and entered judgment in Plaintiffs' favor for more than $34 million.  On appeal, Minassian asserts the trial court should have granted his inconvenient forum motion, Plaintiffs' claims are barred by the statute of limitations, the court erred by imposing discovery sanctions, and Plaintiffs are barred from recovery because the contract underlying their claims was illegal.  We reject Minassian's arguments and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' father, Gagik Galstian, was a successful businessman in Iran for many years.  During that time, he and Plaintiffs' mother, Knarik Galstian, obtained significant real estate holdings.  The Galstians fled Iran in 1978 during the unrest that led to the Iranian revolution.

In 1996, Gagik entered into a contract with Minassian— who was a family friend—to try to reclaim some of his properties in Iran.  To effectuate the agreement, the Galstians executed powers of attorney granting Minassian authority to act on their behalf in reclaiming and selling the properties.  Gagik and Knarik died in 2012.

---

[1]     Minassian died while this appeal was pending.  On his motion, we substituted the special administrator of Minassian's estate as the appellant in this case.  (See Cal. Rules of Court, rule 8.36(a).)

In January 2013, Plaintiffs filed a complaint against Minassian, alleging he conspired with another individual to steal their parents' properties and defraud them out of tens of millions of dollars. Plaintiffs brought their claims individually and as trustees of their parents' trust. Their operative complaint asserted causes of action for unjust enrichment and money had and received.

The case proceeded to a bench trial in 2017, after which the court issued a 61-page statement of decision finding in Plaintiffs' favor. The court summarized its conclusions as follows: "[B]y at least 2006, with a few isolated exceptions, it appears that Minassian began what was essentially an effort to acquire all of the Galstian properties for himself and, in the instance of any sale, to keep all, or some, of the money received for himself. In order to accomplish this, he failed to advise the Galstians that he had utilized the power of attorney he had been given by Galstian to transfer title to nearly all of the real estate assets to himself, failed to truthfully advise them of the status of the properties and failed to account for sales from which he kept some or all of the proceeds for himself. He has engaged in numerous transactions which he has not described or explained even up to the present time, often stating that he does not remember. He also has had evidentiary sanctions imposed because of his failure to produce documents and the net result of the purported lack of memory and the failure to produce records substantially impacted the court's, and the Plaintiffs', ability to reconstruct the events. Whatever his intentions were when he and Galstian made their agreement, he has deliberately and systematically taken Plaintiffs' property, and many proceeds therefrom, for himself on numerous occasions."

3

The court entered judgment in Plaintiffs' favor for $34,506,989 plus interest.  Minassian appealed.

## DISCUSSION

**I.    The Court Properly Denied Minassian's Renewed Inconvenient Forum Motion**

Minassian contends the trial court erred in denying his renewed motion to dismiss or stay based on inconvenient forum. We disagree.

### A. Background

After Plaintiffs filed their first amended complaint, Minassian moved to dismiss or stay the action based on inconvenient forum.  He argued the Iranian civil court would provide a suitable forum because the action concerned a dispute among Iranian citizens over property located in Iran.  Minassian also represented that Plaintiffs had already participated in legal proceedings against him in Iran involving the same claims.  The trial court stayed the action pursuant to Code of Civil Procedure section 410.30, subdivision (a).[2]

Plaintiffs appealed and we reversed in *Aghaian v. Minassian* (2015) 234 Cal.App.4th 427 (*Aghaian I*), holding Iran is not a suitable alternative forum.  We explained the "evidence is overwhelming that Iranian courts discriminate against women and non-Muslims.  Among other things, Plaintiffs submitted evidence that the testimony of a woman counts for half the value of that of a man, and that women are not treated equally before the courts, particularly in personal status matters relating to marriage, divorce, inheritance, and child custody, and only men can serve as judicial officers. . . .  Two of the three Plaintiffs here

---

[2]    All further undesignated statutory references are to the Code of Civil Procedure.

are women and the Galstian family members are not Muslim. Leaving aside whether Iranian courts are independent or corrupt, this is sufficient to show Iran is not a suitable alternative forum. This is the 'rare circumstance' in which an alternative forum 'provides no remedy at all.' " (*Aghaian I, supra,* 234 Cal.App.4th at pp. 435–436.)

On remand, Minassian filed a "renewed" motion to dismiss or stay based on inconvenient forum. He argued the motion was warranted because, while the initial appeal was pending, Plaintiffs filed a new civil lawsuit against him in Iran asserting the same claims. In doing so, Minassian insisted, Plaintiffs waived any argument that Iran is an inadequate forum.

Plaintiffs urged the court to deny Minassian's motion on multiple grounds, including under the law of the case doctrine. Plaintiffs also represented that the Iranian action sought only to quiet title to a subset of properties at issue in this case. Moreover, unlike the present case, they did not seek compensatory damages in Iran.

The court denied the renewed motion, explaining the "key facts" underlying our decision in *Aghaian I*—that women and non-Muslim parties are not afforded equal rights and due process in Iranian courts—had not changed since Minassian's first motion. The court further pointed out that Minassian cited no authority showing an unsuitable forum becomes suitable by virtue of the plaintiff submitting to its jurisdiction.

**B. Relevant Law**

The doctrine of inconvenient forum (often referred to as forum non conveniens) allows courts to "exercise their discretionary power to decline to proceed in those causes of action which they conclude, on satisfactory evidence, may be more

5

appropriately and justly tried elsewhere." (*Price v. Atchison, T. & S. F. R. Co.* (1954) 42 Cal.2d 577, 584.) The doctrine is codified in two statutes—sections 418.10 and 410.30—which differ as to the timing of the motion.

Minassian filed his motion under section 418.10, which permits a defendant, "on or before the last day of his or her time to plead," to move to stay or dismiss the action on the ground of inconvenient forum. (§ 418.10, subd. (a).) If the court denies the motion, the defendant may file a petition for writ of mandate challenging the order. (§ 418.10, subd. (c).) If the defendant does so, the time to plead is extended until after the court rules on the petition. (*Ibid.*)

A defendant who has already entered a general appearance may file an inconvenient forum motion under section 410.30. (*Britton v. Dallas Airmotive, Inc.* (2007) 153 Cal.App.4th 127, 134–135; *Global Financial Distributors Inc. v. Superior Court* (2019) 35 Cal.App.5th 179, 192.) Section 410.30 provides: "When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (§ 410.30, subd. (a).)

"In determining whether to grant a motion based on forum non conveniens, a court must first determine whether the alternate forum is a 'suitable' place for trial." (*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751.) If the alternative forum is suitable, the court then considers the private and public interests in retaining the action for trial in California. (*Ibid.*) If the private and public interests weigh in favor of a suitable alternative forum, the trial court generally has discretion to

6

either dismiss or stay the action on any conditions that may be just.  (§ 410.30, subd. (a); see *Laboratory Specialists Internat., Inc. v. Shimadzu Scientific Instruments, Inc.* (2017) 17 Cal.App.5th 755, 764; *Archibald v. Cinerama Hotels* (1976) 15 Cal.3d 853, 857.)  "The burden of proof is on the defendant, as the party asserting forum non conveniens."  (*Fox Factory, Inc. v. Superior Court* (2017) 11 Cal.App.5th 197, 204.)

### C. Analysis

#### 1. Minassian May Challenge the Order Denying His Inconvenient Forum Motion

At the outset, Plaintiffs urge us to adopt a rule that an order denying an inconvenient forum motion cannot be challenged on appeal from a final judgment.  We decline the invitation.

"The right to appeal in California is generally governed by the 'one final judgment' rule, under which most interlocutory orders are not appealable."  (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 754.)  Such orders instead may be challenged on appeal of the final judgment.  (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 418.)

There are, of course, exceptions to this rule.  For example, an order denying a motion to quash service for lack of personal jurisdiction generally may not be challenged on appeal from a final judgment.  (*McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252, 258; *State Farm General Ins. Co. v. JT's Frames, Inc.* (2010) 181 Cal.App.4th 429, 437 ["It has long been the rule in California that a defendant who chooses to litigate the merits of a lawsuit after its motion to quash has been denied has no right to raise the jurisdictional question on appeal."].)

7

Plaintiffs urge us to adopt a rule that a denial of an inconvenient forum motion, like the denial of a motion to quash for lack of personal jurisdiction, may not be challenged on appeal of a final judgment. They contend such a rule makes sense because section 418.10 governs both inconvenient forum motions and motions to quash. That same statute, moreover, expressly permits a defendant to file a writ petition to challenge an order denying an inconvenient forum motion, which Plaintiffs insist provides sufficient review. (§ 418.10, subd. (c).)

Plaintiffs also contend there are sound policy reasons for such a rule. According to Plaintiffs, "[v]enue, like personal jurisdiction, is a threshold issue that should be conclusively decided at the outset of the litigation, so the parties and the court need not go through an expensive and time-consuming trial only to learn on appeal that the whole trial, even if free from reversible error, must be repeated in a different court."

We do not agree with Plaintiffs that an order denying an inconvenient forum motion should be treated the same as an order denying a motion to quash for lack of personal jurisdiction. The rationale underpinning the motion to quash rule is that a defendant who makes a general appearance forever waives a personal jurisdiction objection.[3] (*McCorkle v. City of Los Angeles, supra*, 70 Cal.2d at pp. 257–258.) The same reasoning does not

---

[3] In light of this rationale, the Supreme Court has recognized that a defendant may challenge on appeal the denial of a motion to quash where he or she does not make a general appearance and a default judgment is entered. (*McCorkle v. City of Los Angeles, supra*, 70 Cal.2d at p. 258.) In other words, an order denying a motion to quash may be challenged on appeal of a final judgment, but only if the plaintiff does not waive the issue by entering a general appearance.

apply to inconvenient forum motions. Unlike personal jurisdiction, a defendant who makes a general appearance does not waive the inconvenient forum issue. To the contrary, section 410.30 permits a defendant to bring such a motion after making a general appearance. (*Britton v. Dallas Airmotive, Inc.*, *supra*, 153 Cal.App.4th at pp. 134–135; *Global Financial Distributors Inc. v. Superior Court, supra*, 35 Cal.App.5th at p. 192.) Moreover, section 410.30 does not set a deadline for a defendant to file an inconvenient forum motion, which undercuts Plaintiffs' policy argument that venue should be conclusively decided at the outset of litigation; the Legislature clearly believes otherwise.

We also do not agree with Plaintiffs' suggestion that, because section 418.10 expressly permits the defendant to challenge an adverse ruling via a writ petition, inconvenient forum motions brought under that statute should be treated differently from motions brought under section 410.30. "[T]he Legislature knows how to make writ review the exclusive mode of review if it wants to." (*Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 636.) Section 170.3, for example, states a "determination of the question of the disqualification of a judge is not an appealable order and may be reviewed *only by a writ of mandate*." (§ 170.3, subd. (d), italics added.) Similarly, Business and Professions Code section 2337 provides "review of the superior court's decision [regarding revocation or suspension of a medical license] *shall be pursuant to a petition for an extraordinary writ*." (Italics added.) Section 418.10, in contrast, states a defendant "*may* petition an appropriate reviewing court for a writ of mandate . . . ." (§ 418.10, subd. (c), italics added.) Such permissive language does not preclude postjudgment appellate review. (See *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.*,

9

*supra*, 86 Cal.App.4th at p. 637 [section 877.6, which provides an aggrieved party "may" petition for review by writ of mandate, does not preclude postjudgment appellate review].)

Accordingly, we follow the general rule that an interlocutory order—in this case, the order denying Minassian's renewed inconvenient forum motion—may be challenged on appeal of the final judgment.

### 2. The Trial Court Properly Denied Minassian's Renewed Motion

Minassian contends the trial court improperly applied the law of the case doctrine to deny his renewed motion. We disagree.

" 'The doctrine of "law of the case" deals with the *effect of the first appellate decision on the subsequent retrial or appeal:* The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.) The doctrine "precludes a party from obtaining appellate review of the same issue more than once in a single action." (*Katz v. Los Gatos–Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62; see *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434.) "The law of the case may apply even where the appeal is from a decision short of a full trial, including a judgment on a demurrer, a nonsuit order or denial of an anti-SLAPP motion." (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 356.)

In *Aghaian I*, we determined Iran is not a suitable forum, which was necessary to our ultimate holding that the court erred

in granting Minassian's original inconvenient forum motion.  (See *Aghaian I, supra,* 234 Cal.App.4th at p. 429 ["The sole issue on appeal is whether Iran is a suitable alternative forum.  It is not.  Thus, we reverse the court's order."].)  As such, that determination is law of the case and defeats Minassian's renewed motion, which required he show Iran is a suitable alternative forum.

Minassian contends the law of the case doctrine is irrelevant because it applies only to legal principles, whereas the question of whether Iran is a suitable forum is a factual issue.  (See *People v. Boyer* (2006) 38 Cal.4th 412, 441–442.)  Minassian is wrong.  As we explained in *Aghaian I*, when "the facts are not disputed, the effect or legal significance of those facts is a question of law . . . ."  (*Aghaian I, supra,* 234 Cal.App.4th at p. 434.)  We then proceeded to determine that, on the record before us, Iran is not a suitable forum *as a matter of law*.

Minassian alternatively suggests the law of the case doctrine does not apply because his renewed motion was based on new evidence.  (See *People v. Boyer, supra,* 38 Cal.4th at p. 442 [law of the case "controls the outcome on retrial only to the extent the evidence is substantially the same"].)  He points out that between his initial motion and the renewed motion, Plaintiffs filed an action in Iran.  According to Minassian, by doing so, they waived any argument that Iran is not a suitable forum.

Minassian provides no authority to support his waiver argument, nor are we aware of any.  He similarly fails to provide authority that the existence of a pending action in an alternative forum is relevant to determining whether it is suitable.  In the absence of such authority, Minassian has not shown the record on remand differed in a meaningful way.  As the trial court noted,

11

the key facts in *Aghaian I* that led us to conclude Iran is not a suitable forum have not changed.  The law of the case doctrine applies and compels the denial of Minassian's renewed inconvenient forum motion.

## II.    Plaintiffs' Claims Are Not Barred By the Statute of Limitations

Minassian contends Plaintiffs' claims are barred by the statute of limitations.  We disagree.

### A. Background

Plaintiffs filed their original complaint on January 7, 2013, and their first amended complaint (FAC) less than a month later.

In September 2013, Plaintiffs filed declarations under section 377.32, in which they asserted, among other things: (1) no proceeding is pending for the administration of their parents' estates; (2) they are their parents' successors in interest with respect to the pending action; and (3) no other person has a superior right to commence the action.

While the first appeal in this case was pending, a probate estate was opened for Gagik.  On June 19, 2015—about a week after the remittitur was issued—Plaintiffs filed new section 377.32 declarations, which referenced the probate estate.

Plaintiffs filed a second amended complaint (SAC) in September 2015.  Minassian demurred, arguing Plaintiffs lacked standing because their section 377.32 declarations were incomplete or contained errors.  He further argued Plaintiffs' claims were barred because the statute of limitations had run before they obtained standing.  The trial court disagreed, relying on *Parsons v. Tickner* (1995) 3l Cal.App.4th 1513 for the proposition that a section 377.32 declaration is not a prerequisite to filing or continuing an action.

12

**B. Analysis**

Minassian does not dispute that Plaintiffs filed their original complaint within the applicable statute of limitations. Nonetheless, he insists Plaintiffs lacked authority to pursue their claims until they filed their second set of section 377.32 declarations in June 2015.[4]  As a result, he argues, the original complaint and FAC are nullities, and the first valid complaint was the SAC, which was filed after the statute of limitations had run.  We disagree.

Generally, "a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period."  (§ 377.20, subd. (a).)  Under section 377.30, a "cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest, . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."

Section 377.32, in turn, requires a "person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest" file a declaration stating, among other things, (1) " 'no proceeding is now pending in California for administration of the decedent's estate,' " (2) the declarant is the decedent's successor in interest, and (3) "[n]o other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding."  (§ 377.32, subd. (a).)

---

[4]    For unexplained reasons, Minassian simply ignores Plaintiffs' first set of declarations filed in September 2013.

13

Here, Plaintiffs asserted causes of action as their parents' successors in interest, yet they filed their section 377.32 declarations well after commencing the action. Section 377.32, however, "does not require that the affidavit be filed as a condition precedent to commencing or continuing the action." (*Parsons v. Tickner, supra*, 31 Cal.App.4th at p. 1523.) Instead, at most, "failure to file the affidavit could possibly subject the action to a plea in abatement." (*Id.* at pp. 1523–1524.) That Plaintiffs failed to immediately file their section 377.32 declarations, therefore, does not render the original complaint and FAC nullities.

Minassian alternatively argues the initial complaint and FAC were nullities because the causes of action belonged to Plaintiffs' parents' estates and could be pursued only by the personal representatives of those estates. Minassian does not support this argument with meaningful analysis, relevant authority, or a single citation to the record. Accordingly, we consider the issue forfeited. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)

Minassian suggests that, even if the pleadings were not nullities, the statute of limitations nonetheless continued to run until Plaintiffs filed their declarations. In support, he cites *Bourhis v. Lord* (2013) 56 Cal.4th 320 (*Bourhis*) for the proposition that the running of a statute of limitations is a substantive defense, which cannot be prejudiced by subsequent acts by a plaintiff to gain the ability to sue. However, as the Supreme Court explained in *Bourhis*, this rule specifically applies to suspended corporations and arises out of Revenue and

14

Taxation Code section 23305a, which provides a suspended corporation's subsequent revival "shall be without prejudice to any action, defense or right which has accrued by reason of the original suspension or forfeiture . . . ." There is no analogous statute governing section 377.32 declarations. As such, Minassian's reliance on *Bourhis* is misplaced.

Minassian further argues in his reply brief that the SAC did not relate back to the original complaint because it alleged different injuries suffered by different people. Specifically, he insists the original complaint stated claims for injuries to Plaintiffs personally, whereas the SAC alleged claims based on injuries to their parents.

Confusingly, Minassian seemed to argue the opposite in his opening brief. He claimed the "purported causes of action asserted [in the original complaint] belonged to [Plaintiffs'] parents' estates, not to them," and Plaintiffs did not "allege any injury suffered by them at the hands of the defendant, but rather only injuries suffered by their parents."

We agree with Minassian's initial position. Plaintiffs' original complaint alleged they are the children and heirs of their deceased parents, Gagik and Knarik. It alleged the case arose out of "fiduciary duties *owed to Gagik and Knarik*, and through them to Plaintiffs and the Trust." (Italics added.) Further, it requested the court prohibit Minassian from "[t]ransferring or encumbering any of *Gagik's or Knarik's properties* . . . ." (Italics added.) As Minassian seemed to recognize in his opening brief, the clear implication of these allegations is that Plaintiffs sought relief for injuries to their parents, rather than injuries to themselves. Accordingly, we reject Minassian's belated argument that Plaintiffs' various complaints alleged different injuries.

15

## III. The Court Did Not Abuse Its Discretion by Imposing Discovery Sanctions on Minassian

Minassian contends the trial court improperly imposed sanctions on him for abusing the discovery process. We disagree.

### A. Background

In August 2015, Plaintiffs propounded discovery requests seeking information and documents related to the properties at issue in the case. Following an informal discovery conference, Minassian agreed to provide responses and documents by January 29, 2016. The trial court issued a stipulated order to that effect.

In February 2016, Plaintiffs moved for terminating, issue, and evidentiary sanctions on the basis that Minassian failed to meaningfully respond to their interrogatories or produce all relevant documents related to the properties at issue, including appraisals, deeds, mortgage documents, accountings, sales records, and payment records.

Minassian admitted his production was "below expectations." According to Minassian, he believed he had additional responsive documents at his home in Iran, and he originally planned to travel there to retrieve them. However, as he was preparing to depart, he learned he could not travel to Iran until he renewed his Iranian passport. Minassian submitted the passport for renewal in January 2016, but it had not yet been processed. Minassian represented that he would return to Iran to obtain the documents as soon as he received his renewed passport.

The trial court declined to terminate the case, and instead imposed issue, evidentiary, and monetary sanctions. It found Minassian's failure to comply with the court's prior discovery

16

order was "willful and without substantial justification." The court explained: "Defendant's claimed reason for failing to comply [with the discovery order] is that he did not realize his Iranian passport was expiring and that Iran requires the passport to be valid for six months after entry. But Defendant cites no admissible evidence in support of his contention, beyond his own declaration, which is hearsay and [Defendant] is not qualified to testify as to Iranian law. And Defendant offers no plausible explanation as to precisely when he discovered the issue with his passport and neither Defendant nor his attorney offers any explanation as to why Plaintiffs' counsel and the Court was not immediately notified when this passport issue was discovered. . . . [¶] Moreover, there has been no believable reason offered by the defendant as to why he has to personally go to Iran to obtain the documents. Apparently they are in boxes at his home in Tehran. Additionally, he is involved in both civil and possible criminal litigation in Iran and is apparently represented by lawyers there. Hence, why can't his Iranian lawyers obtain these documents and send them in some manner to the defendant here in Los Angeles? No reasonable explanation has been offered."

In addition to monetary sanctions, the court issued four evidentiary/issue sanctions as follows:

(1) "The jury will be instructed that Defendant failed to comply with the Court's [discovery] order and the jury will be instructed it is permitted, but not required, to find that if Defendant had complied such information would have revealed Defendant misrepresented the true sales prices of Plaintiffs' properties."

17

(2) "[T]he jury will be instructed it is permitted, but not required, to find that if Defendant had complied [with the discovery order] such information would have revealed Defendant sold or leased Plaintiffs' properties for their fair market value."

(3) "Defendant is precluded from presenting evidence regarding the actual sales or lease price of Plaintiffs' properties."

(4) "Defendant is precluded from presenting evidence regarding any costs or expenses he incurred in redeeming, selling, or leasing Plaintiffs' properties."

The court stayed the sanctions pending Minassian's compliance with the initial discovery order by May 16, 2016.

On May 20, Plaintiffs moved to lift the stay based on Minassian's noncompliance with the court's order. According to Plaintiffs, Minassian failed to produce documents related to the vast majority of the 255 properties at issue in the case, and his interrogatory responses continued to be evasive and incomplete.

In opposition, Minassian submitted a declaration in which he detailed his efforts to comply with the court's order. According to Minassian, he decided not to travel to Iran because he was advised by a lawyer that, due to a criminal conviction, he would not be allowed to leave the country once he entered it. So instead, he instructed four people to search his apartment for documents related to the case (he apparently remembered a friend in Iran had a spare key to his apartment). He then turned over to Plaintiffs all the relevant documents they found. Minassian explained he did not possess many of the documents Plaintiffs requested because he was never the custodian of

18

records or the primary person responsible for the relevant transactions.

Following the hearing, the court granted Plaintiffs' motion to lift the stay, with minor modifications to the evidentiary sanctions.[5]  The court noted that Minassian's interrogatory responses continued to be evasive and incomplete.  In addition, "[w]hile Minassian admits to being involved in selling and reclaiming 255 properties belonging to Plaintiffs, he produced: (1) sales agreements for 55 of the 255 properties; (2) accounts for 11 of the 255 properties . . . ; (3) deeds for 55 of the 255 properties; (4) communications . . . related to 2 of the 255 properties; (5) 12 documents reflecting payments made to Plaintiffs' family . . . ; (6) no appraisals even though his Cross-Complaint references appraisals valuing a portion of the properties between $75–80 million; and (7) no documents related to mortgages, loans, or leases even though Minassian testified that many of the properties had been leased or mortgaged."

The court continued:  "Minassian now for the first time presents the argument that he was not in custody or control of much of the requested records, when before his excuse was he could not travel to Iran to retrieve the documents.  It has been excuse after excuse from Minassian as to his complete failure to comply with repeated discovery orders and his obligations and the Court is left with no choice but to lift the stay for such repeated failure."

---

[5]  Among other minor changes, the court modified the third and fourth sanctions to permit Minassian to present evidence corroborated by documents he produced in discovery.

19

In its statement of decision, the trial court indicated its calculation of damages was consistent with the evidentiary sanctions as follows.  Where Minassian advised Plaintiffs of the sales price of a property that was substantially inconsistent with its fair market value, the court assumed the fair market value was the actual price, unless other evidence showed the reported price was true and fair.  Similarly, where Minassian sold a property without evidence of the sales price, the court assumed it was sold for the fair market value, unless evidence showed otherwise.

### B. Relevant Law

"California discovery law authorizes a range of penalties for conduct amounting to 'misuse of the discovery process.' " (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991, quoting § 2023.030.)  Misuses of the discovery process include "[f]ailing to respond or to submit to an authorized method of discovery" and "[d]isobeying a court order to provide discovery."  (§ 2023.010, subds. (d) & (g).)

Section 2023.030 permits the trial court to impose monetary and nonmonetary sanctions on a party for abusing the discovery process.  Among other forms of sanctions, the court may "impose an issue sanction by an order prohibiting any party engaging in the misuse of the discovery process from supporting or opposing designated claims or defenses." (*Id.*, subd. (b).)  The court may also prohibit the party from introducing designated matters in evidence.  (*Id.*, subd. (c).)  Although not expressly required by statute, courts have noted that, absent unusual circumstances, nonmonetary sanctions are warranted only if a party willfully fails to comply with a court order.  (See *Lee v. Lee* (2009) 175 Cal.App.4th 1553, 1559; *Liberty Mutual Fire Ins. Co.*

20

*v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102 (*Liberty Mutual*); *Biles v. Exxon Mobil Corp.* (2004) 124 Cal.App.4th 1315, 1327.)

We review the trial court's imposition of discovery sanctions for abuse of discretion. (*Liberty Mutual, supra*, 163 Cal.App.4th at p. 1102.) A court abuses its discretion when it acts arbitrarily, capriciously, or beyond the bounds of reason. (*Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1249–1250.)

**C. Analysis**

Minassian first contends the sanctions were improper because there was no showing he willfully defied his discovery obligations. According to Minassian, he produced all the documents he possessed and was therefore unable to comply with the court's order to a greater extent. We disagree.

Initially, Minassian completely ignores the court's finding that he gave inadequate responses to Plaintiffs' interrogatories, which alone provided a sufficient basis for the sanctions. Moreover, given Minassian's role in the transactions and the significant sums at stake in those transactions, the trial court could reasonably infer he was in possession of more documents than he produced. Consistent with this inference, Minassian initially objected to Plaintiffs' requests for production on the basis that "the cost of obtaining and shipping such large quantities of documents . . . is an exceptional circumstance obviating any obligation to comply with the request."

The trial court was also free to disregard Minassian's self-serving claim that he produced all the relevant documents in his possession. Minassian, after all, previously made suspect excuses for his failure to produce more documents. In response to

21

Plaintiffs' request for sanctions, for example, he claimed he was unable to obtain the relevant documents because they were in his apartment in Iran, yet he could not travel there and no one else had access to it. As the court pointed out, such claims were simply not credible. Not surprisingly, after the court issued its sanctions order, Minassian was quickly able to arrange for someone to search his apartment in Iran. On this record, the court was reasonably skeptical of Minassian's latest excuse for his failure to comply with his discovery obligations. The court did not act arbitrarily, capriciously, or beyond the bounds of reason.

For the first time in his reply brief, Minassian argues the sanctions were improper because the court did not make an express finding that he acted willfully. Initially, Minassian forfeited this argument by failing to explicitly raise it in his opening brief. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583 ["[P]oints raised for the first time in a reply brief on appeal will not be considered."].)

Even if we were to overlook the forfeiture, we would reject Minassian's argument on the merits. Minassian has not provided any relevant authority supporting his claim that the court was required to make an express finding of willfulness. He cites *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, but that case concerned a different statute—former section 2034, subdivision (d)—which explicitly required a finding of willfulness. (See *Puritan Ins. Co. v. Superior Court* (1985) 171 Cal.App.3d 877, 884 [by its own terms, section 2034, subdivision (d) is limited to cases of willful failure to comply]; *Kohan v. Cohan* (1991) 229 Cal.App.3d 967, 971.) Here, the court issued the sanctions pursuant to section 2023.030, subdivisions (b) and (c). Neither provision requires willfulness, much less an express finding of such.

22

In any event, contrary to Minassian's contentions, the court did make an express finding of willfulness. Indeed, the court's initial sanctions order states: "[T]his court finds that defendant's failure to comply with this court's previous order was willful and was without substantial justification."

Minassian alternatively contends the sanctions were excessive because they effectively relieved Plaintiffs of their burden of proving liability and damages. Once again, we disagree.

With respect to liability, Minassian claims the sanctions permitted an inference that a sale occurred if the Galstians lost their title to a property. Presumably, he is referring to the second sanction, which allowed the trier of fact to assume Minassian "sold or leased Plaintiffs' properties for their fair market value at the time of said sale or lease." The wording of the sanction is somewhat ambiguous. It could mean the trier of fact was free to assume both that Minassian sold or leased the properties, and that he did so at fair market value. Alternatively, it could simply mean that for any properties Minassian sold or leased, the trier of fact could assume he did so at fair market value. The trial court, however, removed any ambiguity when it indicated in its statement of decision that it considered this sanction only for purposes of calculating damages. The sanction, therefore, did not relieve Plaintiffs of the burden of proving liability.

Minassian is also wrong to claim the sanctions relieved Plaintiffs of their burden of proving damages. The sanctions simply permitted the trier of fact to assume the properties that were sold or leased were done so at fair market value. Plaintiffs,

23

therefore, still had the burden to prove the fair market value of the properties in order to show damages.

## IV. The Court Properly Awarded Plaintiffs Equitable Relief

Minassian contends the trial court erred in awarding Plaintiffs relief because the contract underlying their claims was illegal and unenforceable. We disagree.

### A. Background

Minassian filed a motion for judgment on the pleadings challenging Plaintiffs' second amended complaint on the basis that the claims arose out of an illegal contract. Specifically, he argued his agreement with Gagik violated the United States government's sanctions on Iran, including Executive Order No. 12959 and the Iranian Transactions and Sanctions Regulations ("Iran Sanctions").

In opposition, Plaintiffs argued the contract was not illegal because Minassian could have lawfully reclaimed and sold the properties so long as he obtained licenses from the U.S. Office of Foreign Asset Control (OFAC). Although the parties did not specifically contemplate Minassian obtaining such licenses, under the terms of the power of attorney, Minassian was required to complete all legal requirements. Moreover, according to Plaintiffs, it was impossible to obtain the licenses at the time of contracting because the licensure application required the name of the buyers, which were not known at that time.

Plaintiffs alternatively urged the court to enforce the contract on equitable grounds. In support, they pointed out that in 2012, OFAC issued a general license legalizing the sort of real estate transactions contemplated under the contract.

The trial court determined the contract was illegal and granted Minassian's motion on that basis. Nonetheless, it granted Plaintiffs leave to amend their complaint to include any possible claims for equitable, rather than legal, relief.

Plaintiffs' operative third amended complaint asserted causes of action for unjust enrichment and money had and received.[6] It alleged Minassian was unjustly enriched and received money and/or property that was intended to be to Plaintiffs' benefit by (1) keeping the proceeds from the sales of Plaintiffs' properties entirely for himself; (2) underreporting the proceeds from the sales and keeping a larger share of the proceeds for himself; and (3) taking possession of Plaintiffs' properties and putting them in his own name without receiving authorization or paying Plaintiffs consideration. In relief, Plaintiffs sought restitution of all amounts by which Minassian was unjustly enriched.

Minassian renewed his illegality defense at trial. The court again found that, although the contract was illegal, Plaintiffs were entitled to pursue equitable relief. We discuss the court's decision in more detail below.

## B. Enforcement of Illegal Contracts

Generally, an illegal contract may not serve as the basis for an action, either in law or equity. (*Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 541 (*Kashani*).) By refusing to entertain the enforcement of illegal contracts, courts maintain their integrity while at the same time deterring the formation of such contracts. (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63

---

[6] Despite the court's order, Plaintiffs included both legal and equitable claims in their operative third amended complaint. The court subsequently struck the legal causes of action.

25

Cal.2d 199, 218 (*Tri-Q*); *Tiedje v. Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 454; *Yoo v. Jho* (2007) 147 Cal.App.4th 1249, 1255.) Such a rule also "prevent[s] the guilty party from reaping the benefit of his wrongful conduct," and "protect[s] the public from the future consequences of an illegal contract." (*Tri-Q, supra,* 63 Cal.2d at p. 218.)

The general rule that courts will not enforce illegal contracts is not absolute. Rather, "[t]he fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered." (*Norwood v. Judd* (1949) 93 Cal.App.2d 276, 288–289 (*Norwood*).) As explained in *Norwood*, courts should not apply the general rule when: (1) the public cannot be protected because the transaction has been completed; (2) no serious moral turpitude is involved; (3) the defendant is the one guilty of the greatest moral fault; and (4) to apply the rule will permit the defendant to be unjustly enriched at the expense of the plaintiff. (*Ibid.*; see *Tri-Q, supra*, 63 Cal.2d at pp. 218–220 [quoting *Norwood* with approval]; *Johnson v. Johnson* (1987) 192 Cal.App.3d 551, 557; *Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 196; *Homestead Supplies, Inc. v. Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 990.) "In such circumstances, equitable solutions have been fashioned to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff." (*Southfield v. Barrett* (1970) 13 Cal.App.3d 290, 294.)

**C. The Iran Sanctions[7]**

In 1995, President Clinton issued Executive Order No. 12959, 60 Federal Register 24757 (May 6, 1995), which imposed

---

[7] Much of our discussion of the Iran Sanctions comes from the comprehensive overview of the topic found in *Kashani, supra*, 118 Cal.App.4th 531.

trade sanctions on Iran.  "The order is clothed with the most serious of purposes, and it is couched in the broadest of terms. It prohibits, with only limited exceptions, the exportation 'of any goods, technology . . . , or services,' the reexportation 'of *any* goods or technology,' the entering into '*any* transaction . . . by a United States person relating to goods or services of Iranian origin,' and '*any* new investment by a United States person in Iran.' [Citation.]  Moreover, it bars '*any* transaction . . . that evades or avoids' its restrictions.  [Citation.]  The obvious purpose of the order is to isolate Iran from trade with the United States." (*United States v. Ehsan* (4th Cir.1998) 163 F.3d 855, 859; see also *Transfair Int'l, Inc. v. United States* (2002) 54 Fed.Cl. 78, 80–81.) OFAC implemented the executive order by promulgating the Iranian Transactions and Sanctions Regulations (31 C.F.R. Pt. 560).

There are "two ways to avoid the prohibitions on dealing with Iran: coverage under a general license authorizing certain categories of transactions (see 31 C.F.R. §§ 501.801(a), 560.311, 560.505–560.535; 31 C.F.R. §§ 501.801(b), 560.312) and issuance of a specific license.  The Regulations state that prohibited transactions 'which are not authorized by general license may be effected only under specific licenses.'  (31 C.F.R. § 501.801(b).)  [¶] . . . A person does not need to apply for a general license because the Regulations themselves authorize the covered transactions." (*Kashani*, *supra*, 118 Cal.App.4th at pp. 546–547, fn. omitted.) In contrast, a "specific license is a document issued by OFAC, upon application, authorizing a particular transaction to a particular person or entity.  (31 C.F.R. 501.801(b).)" (*Id.* at p. 547.)

In October 2012, OFAC issued a general license (the 2012 General License) authorizing the sort of real estate transactions contemplated by the contract in this case. The license provides: "Individuals who are U.S. persons are authorized to engage in transactions necessary and ordinarily incident to the sale of real property in Iran and to transfer the proceeds to the United States, provided that such real property was either acquired before the individual became a U.S. person, or inherited from persons in Iran. Authorized transactions include, but are not limited to, engaging the services of any persons in Iran necessary for the sale, such as an attorney, funds agent, and/or real estate broker." (31 C.F.R. § 560.543(a).)

**D. Analysis**

The trial court determined that, although the underlying contract between Minassian and Gagik was illegal, the factors set out in *Norwood, supra*, 93 Cal.App.2d 276 supported allowing Plaintiffs to pursue equitable relief. We agree with the court's thorough analysis of each factor, as well as its conclusion that permitting Plaintiffs to pursue equitable relief was appropriate in this case.[8]

As to the first factor—whether the public cannot be protected because the transaction has been completed—the trial court determined that ordering Minassian to pay Plaintiffs the value of the properties and money he took would not harm the

---

[8] Because we conclude the trial court properly allowed Plaintiffs to pursue equitable relief, we need not consider Plaintiffs' argument that the underlying contract was legal. For the same reason, Plaintiffs' motion to strike a section of Minassian's reply brief concerning the legality issue is moot.

public because it would not result in any further enrichment to Iran. We agree with the court's analysis of the issue.

Minassian insists permitting Plaintiffs to obtain equitable relief harms the public by providing "direct pecuniary support to the Ayatollah and his terrorist plots." In support, he points to evidence showing the Iranian government receives fees when a person reclaims property from it. Plaintiffs, however, did not seek to enforce the contract or compel Minassian to recover any additional properties from the Iranian government. Instead, they merely sought compensation for the properties and money that Minassian had already improperly obtained. Such relief provides no benefit to the Iranian government.

We also do not agree with Minassian's claim that "effective deterrence" is served only by refusing to permit equitable remedies. In light of the 2012 General License, there is presently no need to deter parties from entering into similar contracts.[9]

As to the second factor, the trial court concluded no serious moral turpitude was involved. The court reasoned that the 2012 General License permits the sort of real estate activities at issue, which makes clear "the contract herein contemplated activity

---

[9] For the first time in his reply brief, Minassian insists the 2012 General License does not apply to most of the properties at issue because it does not authorize the "wind-down of commercial enterprises in Iran." (31 C.F.R. § 560.543(b)(1).) Minassian forfeited this argument by failing to raise it in his opening brief. (*Nordstrom Com. Cases, supra*, 186 Cal.App.4th at p. 583.) In any event, although Minassian points to evidence showing some of the properties at issue were commercial and industrial, he fails to point to evidence showing his reclamation and sales of those properties were done in connection with a wind-down of a commercial enterprise.

29

barred by statute rather than an act of moral turpitude."
Once again, we agree with the court's analysis of the issue.

Relying on *Khamooshpour v. Holder* (D. Ariz. 2011) 781 F.Supp.2d 888 (*Khamooshpour*), Minassian insists a violation of the Iran Sanctions necessarily reflects bad moral character. If anything, however, *Khamooshpour* actually supports the trial court's finding that the violations in this case did not involve serious moral turpitude.

In *Khamooshpour*, a naturalization applicant argued his conviction for willfully violating the Iran Sanctions did not reflect on his moral character because it was not a crime of moral turpitude. (*Khamooshpour, supra*, 781 F.Supp.2d at p. 895.) The federal district court rejected this argument, explaining that non-moral turpitude crimes may nevertheless reflect on an applicant's moral character, at least for purposes of the naturalization statutes. (*Ibid*.) Although never stated explicitly, it appears the court agreed with the applicant that a violation of the Iran Sanctions is not a crime of moral turpitude. Moreover, in finding the conviction negatively reflected on the applicant's moral character, the district court emphasized that the violations were knowing and willful. (*Id*. at pp. 896–897.) Here, Minassian points to no evidence in the record showing Gagik knew the contract contemplated acts that violated the Iran Sanctions. *Khamooshpour*, therefore, is of no help to him.

As to the third factor, the trial court concluded Minassian was the party at greatest moral fault for violating the sanctions. The court explained: "[T]he evidence supports the conclusion that it was Minassian's obligation to obtain a specific license. The power of attorney enumerated numerous powers and duties including that he []was to carry out all relevant legal formalities

30

pertaining to the subject of this power of attorney. . . .  Galstian hired Minassian due, in part, to his knowledge that Minassian maintained a residence in Tehran, understood how to work within the Iranian legal system because of his prior experience and agreed, pursuant to the power of attorney to 'complete all legal requirements' which indicates that Galstian expected Minassian to act legally in fulfilling the goals of their agreement. [Minassian's] experience, skill and reputation would have implicitly reassured Galstian that [Minassian] was, in fact, capable of, and would, act legally.  Most importantly, it should also be noted that in accepting the power of attorney, Minassian undertook a fiduciary obligation to Galstian."

Minassian does not directly contest the court's findings, nor does he argue the court drew the wrong conclusion from them. Instead, he contends Plaintiffs were more at fault because their parents initiated the illegal contract.  While that fact tends to support Minassian's position, it does not substantially affect the trial court's analysis of the issue.  We agree with the court that this factor weighs in favor of permitting Plaintiffs to pursue equitable relief.

As to the final factor—whether the defendant would be unjustly enriched—the trial court found as follows:  "Minassian . . . used his authority . . . to, in effect, acquire the great majority of [the Galstians'] properties for his own benefit and then defend his actions by saying their agreement was illegal and unenforceable. His explanation that he took title to the many properties to protect both title and possession may have had that effect in some instances but nevertheless rings hollow because the transactions reveal his true motivation was his own financial gain.  If that was not so, he would have told Galstian of the sales

31

and other transactions, would have accounted to, and paid the moneys received to, Galstian. . . . Instead, he took Plaintiffs' assets and now, having been caught, defends his actions on the ground that what he has done is illegal, but he should have the benefit thereof."

Once again, Minassian does not meaningfully contest the trial court's factual findings or its analysis of this factor. Instead, relying on *Kashani, supra*, 118 Cal.App.4th 541, he insists there is no possible equitable justification for awarding relief in a case involving a violation of the Iran Sanctions. We disagree.

*Kashani* involved a contract between American citizens and a group of Chinese companies to manufacture and sell computers in Iran. (*Kashani, supra*, 118 Cal.App.4th at pp. 537–538.) The Americans sued the Chinese companies for breach of contract, and the trial court granted the defendants' motion for summary judgment on the basis that the contract violated the Iran Sanctions. (*Id*. at p. 537.) The Court of Appeal affirmed, finding the plaintiffs failed to "establish[] any basis for departing from the practice of courts generally not to enforce a contract in violation of law." (*Id*. at p. 557.) Among other things, the court noted the plaintiffs sought only lost profits, and they did not allege "any benefit was conferred on or retained by defendants, that defendants have been unjustly enriched, or that any joint venture between plaintiffs and defendants retains monies that could be disbursed to the joint venturers." (*Id*., at p. 557.)

Contrary to Minassian's suggestions, *Kashani* does not stand for the proposition that a court may never award relief in a case involving a violation of the Iran Sanctions. Although the court stated generally "an agreement in violation of trade restrictions promulgated for national security reasons . . . should

be unenforceable," it nevertheless proceeded to consider numerous equitable factors before concluding enforcement was not appropriate under the facts of that case. (See *Kashani, supra*, 118 Cal.App.4th at pp. 557–558.) Here, the trial court considered similar factors and found they weighed in favor of providing relief. For the reasons discussed above, we agree with that conclusion.

Finally, we reject Minassian's passing contention that awarding Plaintiffs equitable relief would itself constitute a violation of the Iran Sanctions. Minassian cites *Bassidji v. Goe* (9th Cir. 2005) 413 F.3d 928 (*Bassidji*) in support, but his reliance is misplaced.

In *Bassidji*, the plaintiff sought to enforce guarantees for reimbursement of certain fees he paid to the Iranian government related to a shrimp egg harvesting business in Iran. The Ninth Circuit held the agreement was unenforceable because the "transaction promoted the transfer of wealth to Iran, including, it appears, the payment of fees to the Iranian government." (*Bassidji, supra*, 413 F.3d at p. 935.) The court also declined to permit equitable remedies because doing so would itself "violate the precise terms of the Execute Order . . . [by] provid[ing] funds to the Iranian economy, paying for goods in Iran. As such, it would violate both the letter of the Executive Order and its fundamental purposes." (*Bassidji, supra*, 413 F.3d at p. 939.) Here, in contrast, Plaintiffs sought the return of property and money that Minassian improperly obtained at their expense. Such relief provides no funds to the Iranian government or economy, nor does it otherwise violate the Iran Sanctions.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.

We Concur:


GRIMES, J.


STRATTON, J.

34