Filed 6/12/25  SP Investment Fund I v. Walsh CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SP INVESTMENT FUND I, LLC,<br><br>　　　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>PATRICK WALSH, as Executor, etc., et al.,<br><br>　　　　Defendants and Respondents. | B332702, B334212<br><br>(Los Angeles County Super. Ct. No. 20STCV49845) |

　　　　APPEAL from a judgment and order of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

　　　　Greenberg Glusker Fields Claman & Machtinger, Daniel G. Stone, and Vera Serova for Plaintiff and Appellant.

　　　　Buchalter, Robert Collings Little, and Gabriel G. Green for Defendants and Respondents.

This case, which comes to us after the trial court's grant of a defense motion for summary judgment, concerns the ostensible sale of a limited partnership interest. We primarily consider (under Pennsylvania law) whether a purchase agreement that grants the buyer of a limited partnership interest the immediate ability to exercise certain powers concerning the partnership— without complying with the partnership agreement's provisions governing how a partnership interest may be transferred—is illegal as contrary to the express policy of law.

## I. BACKGROUND

*A.    SPI and Levinson Enter into a Purchase Agreement*

Gil Seton Jr. (Seton) is a principal of plaintiff and appellant SP Investment Fund I, LLC (SPI). In early June 2013, Seton, on SPI's behalf, sent defendant and respondent Fred Levinson (Levinson) a letter enclosing a form purchase and sale agreement (the purchase agreement) to buy Levinson's interest in Colonial Oaks Limited Partnership (Colonial Oaks) for $55,000.[1] The purchase agreement was drafted by SPI.

Levinson, at the time, held a 12% limited partnership interest in Colonial Oaks. Levinson signed the purchase agreement on June 10, 2013, and SPI sent Levinson a check for $55,000, which he deposited.

---

[1]    Levinson died during the pendency of the litigation, and Patrick Walsh, in his capacity as executor of Levinson's estate, was substituted in his place. For the sake of simplicity, we refer to Levinson and his estate as Levinson throughout the opinion.

## 1. *The terms of the purchase agreement*

At the outset, the purchase agreement states, "[Levinson] agrees to sell to [SPI] and [SPI] agrees to purchase from [Levinson] the Partnership Interest," which it defines as "All of [Levinson's] Rights and Claims relating to . . . Colonial Oaks Limited Partnership, a Pennsylvania Limited Partnership," in exchange "for the Purchase Price pursuant to the Terms attached hereto, which are a part of this Agreement."

The attached terms and conditions divided Levinson's Rights with respect to Colonial Oaks into "Economic Rights," and "Partnership Rights." The "Economic Rights" included Levinson's rights to "Economic Benefits," which were defined as "monetary amounts or property paid, distributed, or owed as capital, profit, income, loss or otherwise." "Partnership Rights" were defined to include Levinson's "right to vote as a partner in" the partnership, his "right to review books and records of" the partnership, and his "rights as a beneficiary of fiduciary duties owed by the partnership and/or other partners" in the partnership.

The "Effective Date" of the agreement, June 7, 2013, was the date on which Levinson was to deliver to SPI an assignment of his rights. An assignment was attached to the purchase agreement pursuant to which Levinson assigned to SPI his "entire interest(s)" in Colonial Oaks. Levinson signed the assignment and SPI was to hold the assignment in trust until the "Closing Date" of the purchase agreement.

Under the purchase agreement, Levinson agreed to perform a series of "Additional Covenants," all of which he was required to commence performing as of the signing of the agreement. One of these covenants obligated Levinson "before, on, and after the Closing Date" to "refrain [except without SPI's consent] from

3

selling, assigning, transferring . . . or otherwise disposing of . . . all or any part of the Partnership Interest and from disclosing the existence, pricing and/or provisions of the" purchase agreement. Another required Levinson, again "before, on, and after the Closing Date," to "receive in trust for [SPI] and forthwith to turn over to [SPI] . . . all Economic Benefits received by [Levinson] on or after the Effective Date." A third mandated, once again "before, on and after the Closing Date," to "promptly deliver and communicate to [SPI] . . . any information[,] documents, correspondence, conversations, etc. relating to the Partnership and/or Partnership Interest . . . ." Finally, "before the Closing Date" of the purchase agreement, Levinson was required to "consult with [SPI] with respect to all opportunities to vote, elect or act with regard to the Partnership or the Partnership Interest and then to vote, elect, or act as, and only as, [SPI] requests" and to "consult with [SPI] whenever [Levinson] learns of any potential action that will or might adversely affect the physical condition of the assets and/or financial condition or value of the Partnership or Partnership Interest and then to take such action as, and only as, [SPI] requests . . . ."

The purchase agreement also provided two avenues for closing the contemplated sale of Levinson's Colonial Oaks partnership interest. The first involved closing with the "Necessary Approvals." The "Necessary Approvals" were "any approvals, consents, or other actions of the Partnership . . . that are necessary for [SPI] to receive, exercise, and/or enjoy the full benefit of all or any portion of the Partnership Interest." The second involved "Closing Without Necessary Approvals." If SPI elected to close without the "Necessary Approvals," SPI would

4

hold the assignment in trust, and Levinson would continue to perform the "Additional Covenants." The covenant that required Levinson to provide SPI with notice of all opportunities to vote and to vote in accordance with SPI's wishes before the Closing Date expressly applied "after the Closing Date" if SPI "waived any Necessary Approvals."

The assignment executed with the purchase agreement states it "shall not assign, transfer, or convey to Assignee any portion of such Partnership Interest as to which any approvals, consents, or other actions or inactions of the Partnership . . . as are necessary for Assignee to receive, exercise, and/or enjoy the full benefit of such portion of the Partnership Interest ("Necessary Approvals") have not been obtained [*sic*]." It also provides that if the Necessary Approval(s) were "obtained after the effective date hereof and/or in the future is no longer required to be obtained, the portion of the Partnership Interest associated with the Necessary Approval(s) shall be deemed to be included in this Assignment as of the date of receipt and/or non-necessity of the applicable Necessary Approval(s)."

On December 5, 2014, SPI sent Levinson a letter closing the purchase agreement without the Necessary Approvals.

###   2.     *The parties' evidence regarding other relevant events*

In 2014, Seton contacted Colonial Oaks and requested SPI to be admitted as a limited partner.[2] Around the same time, SPI

---

[2]     In a later email to Seton, counsel for Colonial Oaks stated they initially believed, based on Seton's representations, that he was Levinson's attorney.

5

was copied on a letter from Richard Ernsberger (Ernsberger), counsel for Colonial Oaks, to Levinson, which attached a copy of the portion of the limited partnership agreement that addressed the substitution of limited partners.

In January 2015, Ernsberger sent Seton an email stating he understood "approval has been given for the transfer" and stating Ernsberger would forward a letter on the topic to Seton upon receipt. The record does not reflect such a letter was ever sent to Seton or that Ernsberger's "understanding" was later confirmed. Rather, the following month, Ernsberger sent an email to Seton informing him that in the context of performing a due diligence review of SPI, they had come across an audit involving Seton and a different entity. Ernsberger asked Seton to disclose information regarding any litigation or audits that involved Seton or any affiliated entities. Around the same time, Ernsberger sent a letter to Levinson informing him that if he had sold his limited partnership interest without the general partner's consent, he was in breach of the limited partnership agreement and must take steps to undo the sale.

Insofar as the record reveals, Seton did not provide any further information in response to Ernsberger's letter.[3] Seton decided the better course of action was to demonstrate SPI was not aggressive, to give Colonial Oaks "some space," and to "make a new approach" later.

---

[3]     Seton viewed the request for more information as an indication that Colonial Oaks did not want to approve the transfer to SPI.

Between 2014 and 2020, Levinson represented to SPI, through his accountant and otherwise, that he was cooperating with SPI.

### B.    SPI Sues Levinson

In December 2020, SPI sued Levinson in Los Angeles County Superior Court alleging causes of action for breach of contract, conversion, and fraud (deceit).  Levinson challenged the sufficiency of the complaint and the trial court ultimately sustained a demurrer to the fraud claim without leave to amend.

The causes of action that remained in a later first amended (and operative) complaint, breach of contract and conversion, allege Levinson breached his duties under the purchase agreement by not forwarding or otherwise disclosing to SPI any documents, communications, or economic benefits he received from Colonial Oaks.  It also alleges Levinson had refused to state whether he continued to own a partnership interest in Colonial Oaks after SPI filed suit, which indicated Levinson may have transferred his partnership interest to someone else.[4]  The operative complaint further alleges Levinson wrongfully retained for himself documents and distributions he received from Colonial Oaks, which he was to hold in trust for SPI pursuant to the purchase agreement.

---

[4]    During the pendency of its lawsuit, SPI obtained evidence demonstrating Levinson had in fact sold the same 12% interest in Colonial Oaks that was the subject of his purchase agreement with SPI to another party in 2017.

7

Levinson eventually filed a motion for summary judgment or, in the alternative, summary adjudication. He argued (1) the purchase agreement was illegal as contrary to law and public policy, (2) Levinson was excused from performing by SPI's failure to obtain the General Partners' consent to the sale, (3) that failure was also a failure to meet a condition precedent in the purchase agreement, and (4) the causes of action were barred by the statute of limitations.

Ernsberger submitted a declaration in connection with the motion for summary judgment. He declared the facts set forth in his declaration were based on his personal knowledge "and/or the pleadings documents and files regularly maintained by [his] office [the law firm of Behrend and Ernsberger, PC] . . . ." Ernsberger averred that Exhibit C to his declaration was "a true and correct copy of the Colonial Oaks Limited Partnership Agreement, which was in effect as of June 7, 2013, and was in effect during the relevant time period."[5]

The Colonial Oaks Limited Partnership Agreement states Colonial Oaks was formed pursuant to the limited partnership laws of Pennsylvania. As relevant here, it provides that a limited partner may only "sell or assign any or all of their Limited

---

[5] Ernsberger also testified at deposition that he had personally viewed and personally reregistered the Colonial Oaks Limited Partnership Agreement with the Pennsylvania Department of State. He further testified that he compared the version of the limited partnership agreement maintained by his office with the copy submitted with the declaration and they appeared to be consistent.

Partnership interest" if they "have obtained the consent of at least one of the General Partners." It similarly provides that by signing the agreement, each limited partner represented and warranted they would "under no circumstances . . . transfer, assign, hypothecate, [or] pledge all or a portion of [their] Limited Partnership interest in the absence of a consent of the General Partners . . . ."

SPI opposed Levinson's summary judgment motion and advanced a number of counterarguments disputing Levinson's contention that the purchase agreement was illegal and invalid. SPI argued Levinson's argument was foreclosed by *SP Inv. Fund I, LLC v. Cattell* (2017) 18 Cal.App.5th 898, a case decided on a motion for judgment on the pleadings. *Cattell* holds a similar purchase agreement was valid and enforceable even though none of the general partners of a limited partnership governed by the laws of New York approved the transfer. SPI argued Levinson was equitably estopped from contesting the enforceability of the purchase agreement because he accepted payment from SPI and represented he was performing under the agreement (all the while selling to a third party in 2017 and hiding the sale from SPI). SPI argued the purchase agreement was not an illegal contract because it did not necessarily require the performance of an unlawful act. SPI argued the partnership agreement was not properly in evidence because Ernsberger had no personal knowledge of the agreement and the agreement had expired by its own terms.[6] And SPI contended Levinson in any event lacked standing to challenge the enforceability of the purchase

---

[6] SPI also separately objected to the Ernsberger declaration.

9

agreement because, in SPI's view, only Colonial Oaks could advance that argument.

In reply, Levinson argued SPI's reliance on *Cattell* opened the door to the introduction of a subsequent unpublished case involving SP Investments III, LLC (*SP Investments III LLC v. Zell* (2018) 2018 WL 6787328), which concluded the purchase agreement in that case was contrary to public policy under the laws of New York, which governed the relevant limited partnership agreement. Levinson further contended SPI was collaterally estopped from enforcing the purchase agreement here based on the ruling in *Zell*.

### D. *The Trial Court Grants the Motion for Summary Judgment*

The trial court granted summary judgment for Levinson. In a minute order explaining its ruling, the court cited Pennsylvania and California law regarding limited partnerships, stating they provide partners the right to determine their membership. The court stated the Colonial Oaks partnership agreement required consent from the general partners for transfers of interest, but the general partners never consented to the transfer here. The court therefore found the purchase agreement invalid, reasoning that the partnership's restrictions on transfer would be wholly frustrated if the purchase agreement were enforced because SPI would have all the rights of a limited partner and Colonial Oaks's ability to restrict who it does business with would be thwarted.

The trial court rejected all of SPI's various arguments to the contrary. It found *Cattell* inapplicable because it did not involve Pennsylvania law and did not consider whether the

10

agreement at issue was contrary to the policy of that law.[7]  The trial court rejected SPI's equitable estoppel argument because the contract was illegal.  It rejected SPI's argument that Levinson lacked standing to argue illegality because he was no longer a member of the partnership.  The court also declined to sever any terms from the purchase agreement because it viewed the contract as having the single object of making SPI a de facto partner without compliance with consent requirements.

### E.      Levinson Seeks and Receives Attorney Fees

Levinson filed a motion for attorney fees on the ground that he was the prevailing party in the action.  The trial court granted the motion in part and awarded Levinson $208,900.80 in attorney fees.

## II.  DISCUSSION

The trial court did not err in granting summary judgment. The court properly considered the Colonial Oaks limited partnership agreement, which provides it is governed by Pennsylvania law.  The Pennsylvania statutes in effect at the time Levinson and SPI entered into the purchase agreement, read in conjunction with the Colonial Oaks partnership agreement, required a Colonial Oaks limited partner to obtain consent before transferring his or her limited partnership interest.  The terms of the purchase agreement impermissibly

---

[7]      Alternatively, insofar as *Cattell* was applicable, the court believed SPI would be collaterally estopped by the ruling in *Zell*, which granted summary judgment against SP Investment Fund III, LLC, because the purchase agreement at issue violated New York law.

11

contravened this requirement by obligating Levinson to allow SPI to control his vote and to provide SPI with any partnership information or documents he received—an obligation that applied from the moment the purchase agreement was signed and regardless of whether SPI ultimately closed the sale with or without the consent of the Colonial Oaks general partners.

### A. *Standard of Review*

"""[A] defendant moving for summary judgment based upon the assertion of an affirmative defense . . . 'has the initial burden to show that undisputed facts support each element of the affirmative defense' . . . . If the defendant does not meet this burden, the motion must be denied." [Citations.]' [Citation.] '[T]he burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense after the defendant meets the burden of establishing all the elements of the affirmative defense. [Citations.]'" (*Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 400.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334.)

*B.     Legality of the Purchase Agreement*
*     1.     Background law[8]*

One of the "essential" elements of a contract is that it have a "lawful object."  (Civ. Code, § 1550, subd. (3).)  "The object of a contract must be lawful when the contract is made, and possible and ascertainable by the time the contract is to be performed."  (Civ. Code, § 1596.)  "The object and meaning of the parties' contract must be determined by their intent at the time of its execution, and it cannot be extended beyond its plain import by circumstances which occurred after its execution, and which were not within their contemplation at the time of execution."  (*Houge v. Ford* (1955) 44 Cal.2d 706, 713.)

"Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."  (Civ. Code, § 1598.)  "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."  (Civ. Code, § 1599.)  "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void."  (Civ. Code, § 1608; see also *Selten v. Hyon* (2007) 152 Cal.App.4th 463, 471 [contract void in its entirety where one of several considerations provided for a contingent fee was illegal].)

---

[8]     The purchase agreement provides it is governed by the laws of the State of California.  Accordingly, California law applies to this portion of our analysis.

"[T]he law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy." (*Kashani v. Tsann Kuen China Enter. Co.* (2004) 118 Cal.App.4th 531, 540.) "Such agreements are 'traditionally referred to as "illegal contracts,"' even though they 'are functionally described as contracts unenforceable on grounds of public policy.' [Citation.]" (*Ibid.*) "'Whether a contract is illegal . . . is a question of law to be determined from the circumstances of each particular case. [Citation.]'" (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126.)

> 2. *The trial court did not abuse its discretion by overruling SPI's evidentiary objections to the Colonial Oaks Limited Partnership Agreement*

"The laws of the state or other jurisdiction under which a foreign limited partnership is organized govern relations among the partners of the foreign limited partnership and between the partners and the foreign limited partnership . . . ." (Corp. Code, § 15909.01, subd. (a).) The law applicable to the Colonial Oaks Limited Partnership Agreement must be determined by reference to the agreement itself. Because SPI challenges the trial court's decision overruling its evidentiary objections to the agreement, we consider that issue first.

SPI argues the Colonial Oaks partnership agreement was hearsay because Ernsberger's declaration, which attached and authenticated the document, was too cursory and was not supported by personal knowledge. On the latter point, SPI contends Ernsberger lacked personal knowledge because he was

14

not the custodian of records for Colonial Oaks and was not yet born when the partnership agreement was executed.

SPI's argument lacks merit. "'Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined as "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is" or "the establishment of such facts by any other means provided by law" ([Evid. Code,] § 1400).' [Citation.] 'The means of authenticating a writing are not limited to those specified in the Evidence Code. ([Evid. Code,] § 1410 ["[n]othing in this article shall be construed to limit the means by which a writing may be authenticated or proved"]; [citation].) For example, a writing can be authenticated by circumstantial evidence and by its contents.' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 87.)

Here, Ernsberger declared under penalty of perjury that he was counsel for Colonial Oaks and that the facts set forth in his declaration were based on files regularly maintained by his law office. As counsel for Colonial Oaks, Ernsberger had access to its corporate documents.[9] The document's contents also suggest it is what it purports to be, and the document itself is not offered for the truth of the matters asserted therein. (See, e.g., *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.) The trial court's admission of the partnership agreement was thus not an abuse of

---

[9] The trial court could fairly infer that Colonial Oaks had some continuity of representation over time. The limited partnership agreement states Colonial Oaks's counsel at the time of formation was "Behrend and Aronson." At the time of his declaration, Ernsberger was an attorney with the law firm "Behrend and Ernsberger, PC."

15

discretion. (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 570 [trial court's evidentiary rulings reviewed for abuse of discretion].)

> ### 3. *Pennsylvania law on the transfer of limited partnership interests as of the date of the purchase agreement*

Because the Colonial Oaks Limited Partnership Agreement provides Pennsylvania law applies, we turn to the relevant statutes. As the question of the legality of a contract is primarily addressed by considering whether the object of a contract was lawful when made (Civ. Code, § 1596), we look to the laws in effect when Levinson and SPI entered into the purchase agreement.[10]

The relevant act in effect when the purchase agreement was executed was the Pennsylvania Revised Uniform Limited Partnership Act effective from October 1989 to February 2017 (PRULPA). (Former 15 Pa.C.S. § 8501.) PRULPA provides that, "[e]xcept as otherwise provided in the partnership agreement: [¶] (1) a partnership interest is assignable in whole or in part; [¶] (2) an assignment of a partnership interest does not dissolve a limited partnership or entitle the assignee to become or to exercise any rights of a partner; [¶] (3) an assignment entitles the assignee to share in such profits and losses, to receive such

---

[10] The performance of a contract may, of course, become illegal if subsequent changes in the law make its object unlawful. (Civ. Code, § 1511.) In such a circumstance, the lack of performance of an obligation is excused by operation of law. (Civ. Code, § 1511, subd. (1); see also (*Baird v. Wendt Enterprises, Inc.* (1967) 248 Cal.App.2d 52, 55.)

16

distributions, and to receive such allocations of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned; and [¶] (4) a partner ceases to be a partner and to have the power to exercise any rights or powers of a partner upon assignment of all of his partnership interest." (Former 15 Pa.C.S. § 8562.) PRULPA accordingly does not expressly address, except insofar as it gives primacy to a partnership agreement itself, an assignee's right to participate in partnership activities or obtain access to partnership documents.

PRULPA also delineated the avenues by which a person could be admitted as a limited partner after the initial formation of the limited partnership. Former section 8564 provides that "[a]n assignee of a partnership interest, including an assignee of a general partner, may become a limited partner: [¶] (1) if and to the extent that the assignor gives the assignee that right in accordance with authority described in the partnership agreement; [¶] (2) if and to the extent that all other partners consent; or [¶] (3) at the time or upon the happening of events specified in the partnership agreement." (Former 15 Pa.C.S. § 8564.)

PRULPA thus distinguishes between a limited partner's entitlement "to share in . . . profits and losses, [and] to receive . . . distributions" and a limited partner's entitlement "to become or to exercise any rights of a partner." (Former 15 Pa.C.S. § 8562.) This comports with long-standing principles of partnership law. Indeed, "[o]ne of the features of a contract of partnership is what is called the *delectus personarum*. Partners have the right to choose those with whom they will be

17

associated."[11] (*Case of Dilworth* (Pa. Com. Pl. 1912) 1912 WL 4162, at *2; see also 68 C.J.S. Partnership § 273 ["Freedom of choice of those who are to compose a partnership is the right of each of those who are contemplating the formation of the firm, and after it has been organized a similar freedom exists in determining the admission of new members."]; Callison & Sullivan, Partnership Law & Practice (2024-2025) Specific partner property rights, § 7:18 ["a distinguishing feature of partnership law is the rule of *delectus personae* (choice of person), to the effect that partners should be permitted to choose their associates"].)

### 4. *The purchase agreement violates the policy of express Pennsylvania law and is thus illegal and unenforceable*

The purchase agreement contravenes the policy expressed in the pertinent Pennsylvania statutes, which seek to preserve the ability of a limited partnership to limit and approve of those who are admitted to their ranks. Upon signing the purchase agreement, Levinson was bound to perform the "Additional Covenants" enumerated by the agreement. Those included a temporally indefinite obligation to inform SPI of any matters that called for a vote of the Colonial Oaks limited partners, and to vote in whatever way SPI directed. It also included a temporally

---

[11] SPI challenges the trial court's reliance on the principle of *delectus personae* on the ground that the case law cited is old and predates the enactment of PRULPA. The age of the principle or the case law explaining it does not affect its continued applicability. And the terms of PRULPA support the continued viability of the doctrine, rather than the contrary.

18

indefinite obligation to transmit to SPI any and all information and documents he received from Colonial Oaks, as well as any distributions or income he received. The purchase agreement further required Levinson to keep this arrangement secret.

While the law freely permits a limited partner to assign his or her right to distributions, the purchase agreement here went much further. As the trial court opined, it effectively allowed SPI to become a de facto partner upon the execution of the agreement, controlling Levinson's vote and obtaining partnership documents without the consent of the remaining partners. And it did so in a manner that prohibited Levinson from alerting anyone to the fact that SPI was silently gaining access to partnership information and controlling Levinson's actions. All of this was contrary to the express terms of the Colonial Oaks limited partnership agreement, which prohibited limited partners from transferring or assigning all or a portion of their right without the consent of at least one general partner.

The purchase agreement thus contravenes "the policy of express law" (Civ. Code, § 1667) that allows a partnership to determine its members.[12] A party may not use a contract to "'"do indirectly that which it could not do directly."'" (*City of Marina v.*

---

[12] As the trial court concluded, the purchase agreement would also be contrary to law under current Pennsylvania statutes, which more expressly state that the transfer of a transferable interest does not (subject to certain exceptions not relevant here) entitle a transferee to participate in the management or conduct of the partnership's activities, or to have access to information or records concerning its activities or affairs. (15 Pa.C.S. § 8672, subd. (a).)

19

*Board of Trustees of California State University* (2006) 39 Cal.4th 341, 358.)

Although SPI believes performance under the purchase agreement in a manner consistent with law was still possible, this does not reckon with the additional covenants that effectively gave SPI authority over Levinson's partnership rights—including the ability to control his vote and obtain partnership documents and information—as of the date the agreement was signed and regardless of which avenue of closing SPI ultimately elected. The trial court rightly concluded this means the terms of the purchase agreement could not be performed legally.[13]

---

[13] At oral argument, SPI argued the assignment Levinson executed in connection with the purchase agreement expressly excluded any portion of Levinson's limited partnership interest that he was not legally permitted to assign. The problem with this argument is twofold. First, it was not briefed and is therefore forfeited; SPI's briefing argued only that SPI was "not seeking to be admitted to Colonial Oaks as a limited partner" and did not contend the assignment excluded any rights Levinson was prohibited from transferring without Colonial Oaks's consent. Second, and in any event, the issue is not which rights Levinson officially transferred to SPI via the assignment when the transaction closed without necessary approvals. Rather, the issue is the nature of the covenants Levinson was immediately, and in perpetuity, bound to perform for SPI. Regardless of whether Levinson assigned his right to vote or right to receive limited partnership documents to SPI via the assignment, upon signing the purchase agreement he was bound to vote as SPI directed and to provide SPI with partnership documents and information. (The purchase agreement provides that the assignment is "modified in conformance with these Terms" and,

SPI argues that, at the time the purchase agreement was signed, Pennsylvania law permitted it to acquire Levinson's interest in Colonial Oaks "in whole or in part" and to share in profits and losses regardless of general partner approval. Even assuming SPI is correct, that does not eliminate the problematic portions of the agreement. As already discussed, the purchase agreement did not purport to transfer to SPI only Levinson's distribution rights. Nor did it limit Levinson's obligations under the additional covenants to providing SPI with any distributions he received from Colonial Oaks, or even suggest the distributions were SPI's primary interest.

SPI also contends the purchase agreement is enforceable under California law because *Cattell, supra*, 18 Cal.App.5th 898 found a quite similar agreement enforceable. *Cattell*, however, is inapposite here. The court in *Cattell*, applying only California law, considered only whether SPI had stated a claim sufficient to survive a motion for judgment on the pleadings (and the record then before the *Cattell* court did not involve the relevant limited partnership agreement, which was governed by New York law). (*Id.* at 900, 906.) Additionally, and crucially, *Cattell* did not decide whether the agreement there was legal *in light of the terms of the relevant limited partnership agreement*, which, again, was not before the court. (*Id.* at 906.) The case is thus neither binding nor persuasive here.[14]

_____

in the event of a conflict between the assignment and the agreement, the agreement "shall be controlling.")

[14] Because we do not find *Cattell* persuasive, we need not address the related argument that SPI was estopped from relying

*C.    SPI's Remaining Arguments Lack Merit*

*1.    The trial court did not abuse its discretion by determining the purchase agreement was not severable*

"The rule requiring courts to withhold relief under the terms of an illegal contract is based on the rationale that the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice as between the parties.  [Citation.]  However, the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances."  (*Southfield v. Barrett* (1970) 13 Cal.App.3d 290, 294.)  "In deciding whether severance is available . . . '[t]he overarching inquiry is whether "'the interests of justice . . . would be furthered'" by severance.'  [Citation.]  'Courts are to look to the various purposes of the contract.  If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced.  If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.'  [Citation.]" (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 996; see also *id.* at 991, 998 [the doctrine of severability "is equitable and fact specific" and it "preserves and enforces any lawful portion of a parties' contract that feasibly may be severed"].)  "Whether [an] agreement is capable of being severed is reviewed de novo pursuant to established rules governing

on that case it because it did not notify the trial court of the existence of *Zell*.

22

contract interpretation." (*Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 54.)

We agree the agreement was not severable. The stated purpose of the purchase agreement was for SPI to buy Levinson's partnership interest, which the agreement defined as all of his rights and claims associated with Colonial Oaks. The purchase agreement did not indicate SPI desired to purchase individual portions of that interest. Additionally, and perhaps more importantly, the terms of the agreement indicate SPI's intent to complete the purchase regardless of whether it ever obtained consent from the general partners. The single object of the agreement was thus for SPI to obtain control of Levinson's shares regardless of the consent of the partnership.[15] The illegality permeates the purchase agreement and the trial court did not err in finding it could not simply sever offending portions.

Though SPI makes no effort to suggest how the offending terms could feasibly be severed from the purchase agreement, it argues its causes of action turn on three provisions that do not purport to make SPI a de facto partner: the requirement that Levinson turn over any distributions he received from Colonial Oaks, the requirement that Levinson turn over any documents he received from Colonial Oaks, and the requirement that Levinson not sell his partnership interest again. As already discussed, the second of those terms does run contrary to the policy of the relevant laws. But, regardless, SPI's ability to identify individual

---

[15]     That Levinson was bound by the terms of the purchase agreement to keep it secret underscores the point. If SPI invariably intended to seek and obtain the partnership's consent, there would have been no need for a provision prohibiting disclosure of even the existence of the agreement.

clauses in the agreement that may not, alone, violate any law or policy does not negate the conclusion that illegality permeated the agreement.

### 2. SPI's remaining contentions

SPI argues the trial court erred in finding no exceptions to the illegality doctrine applied and believes itself to be an innocent party because Levinson sold his interest in Colonial Oaks a second time. There are two problems with this argument. First, SPI cannot reasonably maintain that it was an innocent party as to the illegality in the purchase agreement; SPI provided Levinson with the purchase agreement and had control over its terms—which evidenced an intent to circumvent any restrictions on the transfer of Levinson's partnership interest and to make SPI a de facto partner from the moment the agreement was signed. Second, the evidence indicates that prior to closing the sale, SPI was aware of the clause in the Colonial Oaks partnership agreement regarding the substitution of limited partners, and knew, just as Levinson should have known, that he was not permitted to assign his interest without the permission of at least one of the partners. With such knowledge, SPI cannot claim innocence, and the fact that Levinson then engaged in another sale of the same partnership interest does not absolve SPI's participation in the initial wrong.[16]

SPI contends the trial court erred by finding equitable estoppel did not bar Levinson's motion for summary judgment. But, as the trial court stated, equitable estoppel is not an

---

[16] SPI did not pursue restitutionary or related equitable relief.

available defense where a contract is illegal. (*Waters v. San Dimas Ready Mix Concrete* (1963) 222 Cal.App.2d 380, 383.) SPI argues there are exceptions to that rule, but it identifies no such exception that applies in this case. *City Lincoln-Mercury Co. v. Lindsey* (1959) 52 Cal.2d 267, upon which SPI relies, states that "[a] party to an illegal contract cannot ratify it, cannot be estopped from relying on the illegality, and cannot waive his right to urge that defense. [Citations.] T[h]is rule has been applied in cases where the person asserted to have waived the illegality was not *in pari delicto* and was one of those for whose protection the statute involved was enacted." (*Id.* at 274; see also *Fewel & Dawes, Inc. v. Pratt* (1941) 17 Cal.2d 85, 91 ["An illegal contract cannot be ratified, and no person can be estopped from denying its validity"].) That *City Lincoln* states the principle has been applied as to a party who was not *in pari delicto* (i.e., not equally guilty) means the case does not help SPI here.

SPI further argues the trial court erred in concluding Levinson had standing to assert the purchase agreement is illegal because Levinson is no longer a limited partner in Colonial Oaks. But Levinson is not attempting to enforce the partnership agreement or invoke it in some way that is exclusive to its partners. Rather, he is arguing the purchase agreement, a contract to which he is a party, is illegal because it seeks to circumvent the terms of the Colonial Oaks partnership agreement. As a party to the purchase agreement, Levinson unquestionably has standing to sue to invalidate it. (E.g., *Kanno v. Marwit Capital Partners II, L.P.* (2017) 18 Cal.App.5th 987, 1019 ["'[I]t goes without saying that a party to a contract or one for whom the contract was intended to benefit may bring actions related to such contracts.'"].)

Finally, SPI argues that affirmance of the trial court's ruling will act as a general restraint on the alienability of partnership interests. We see no such danger. The ruling here does not prevent a party from purchasing a partnership interest in compliance with the law and the relevant partnership agreement. It merely prevents would-be purchasers from trying to circumvent those rules.

### D.    *The Attorney Fee Order*

SPI appeals the trial court's order granting Levinson his attorney fees, but the only argument SPI makes is the contention that the attorney fees order must be set aside if the summary judgment order is reversed. Since we affirm the summary judgment, we also affirm the order granting Levinson's attorney fee motion.

DISPOSITION

The judgment and the attorney fees order are affirmed.  In the interests of justice, all parties shall bear their own costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


HOFFSTADT, P. J.


MOOR, J.